### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BRINLEY HOLDINGS INC. and | ) | |
| FREESTREAM AIRCRAFT | ) | |
| (BERMUDA), LTD., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 18-cv-6546 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| RSH AVIATION, INC. and | ) | |
| JOHN T. DUSEK, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This dispute is about an aircraft sale that never got off the ground. Two different brokers tried to buy and resell an airplane, and pocket the difference as profit. They tried to flip the plane, but it flopped. Everything fell apart, and no purchase or sale took place. So one broker sued the other, claiming tortious inference.

Specifically, Plaintiffs Brinley Holdings, Inc. and Freestream Aircraft, Ltd. (collectively, the first broker) wanted to buy an airplane, and sell it to someone else. But so did Defendants RSH Aviation and John Dusek (collectively, the second broker). Each broker negotiated with the would-be buyer, and with the would-be seller.

When Brinley got wind that RSH and Dusek were attempting to cut a deal, Brinley's counsel sent a cease and desist letter, claiming that it had exclusive rights to the plane. RSH and Dusek reached out to the seller, who emphatically denied that Brinley had any such rights. About a week later, RSH and Dusek gave up, and left the scene.

Brinley kept trying to buy and sell the plane. In the end, the buyer inspected the plane, spotted a bunch of problems, and demanded a price reduction totaling millions of dollars. The seller balked, and everyone walked away. They didn't cross the finish line and close the deal. So Brinley blamed RSH and Dusek for getting in the way.

Brinley and Freestream Aircraft filed an eight-count complaint, alleging tortious interference with contract and with prospective economic advantage. Defendants moved for summary judgment. For the reasons stated below, the motion for summary judgment is hereby granted.

## Background

Before diving in, the Court offers the following forewarning. At times, the record is complicated, and somewhat dense. There are a lot of names, and a lot of dates, which can complicate efforts to keep everyone straight. Even pinning down the cast for a particular role can be difficult, too. For example, the would-be buyer (Mahamadou Bonkoungou) was an individual who acted at different times through different affiliates (*i.e.*, Alti, Bolti, and so on).

The parties don't always make things easy, either. Quite the opposite. They fought over every square inch of the record, surrendering no terrain to the other side. Almost every document is a battleground of conflicting interpretations. In their filings, they proceeded as if victory or defeat turned on the outcome of even the smallest facts.

The volume of objections, clarifications, provisos, nitpicks, quibbles, caveats, and disclaimers – plus the insertion of gratuitous material – made the Rule 56.1 statements nearly impenetrable. The parties poured sand into the gears of the other side's Statement of Facts, clogging up the works. They could not resist the impulse to put their spin on the documents, leaving the reader spinning in circles.

For example, Plaintiffs quibbled with the use of the word "competitors." *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 10 (Dckt. No. 79). Defendants got stumped by the phrase "arranged a transaction." *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 1 (Dckt. No. 82). When Defendants offered a simple paragraph about the Letter of Intent and the Offer Letter, Plaintiffs gratuitously injected information about what took place in the months that followed. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 12. And so on.

So, plowing through the record can, at times, be a slog. It is not for the faint of heart. To make things easy, the Court offers the following overview for the reader. The key players are:

| | |
|---|---|
| Broker #1: | Brinley Holdings and Freestream Aircraft |
| Broker #2: | RSH Aviation and John Dusek |
| Would-be Seller: | Yunhua and ICBC (its affiliate) |
| Would-be Buyer: | Mahamadou Bonkoungou and his companies: Alti Management Ltd., Bolti Management Ltd., Molti Management Ltd., and Liza Transport Internationale ("LTI") |

This Opinion will simplify the terminology. As a shorthand, the Court will refer to the first broker as Brinley, the second broker as Dusek or RSH, the (would-be) seller as Yunhua or ICBC, and the (would-be) buyer as Bonkoungou.

Here's a rough overview, in a few paragraphs. Brinley wanted to buy an airplane from Yunhua, and sell it to one of Bonkoungou's companies. The plan was to buy it from Yunhua for $50 million, and sell it to Bonkoungou for $57 million, for a $7 million profit. Along the way, John Dusek and RSH tried to buy and sell the airplane, too.

Yunhua (the seller) negotiated with both brokers. So did Bonkoungou (the buyer).

3

In the end, it all fell apart. Neither broker bought the plane from Yunhua, and neither broker sold the plane to Bonkoungou or his companies. Brinley blamed RSH for the demise of the deals, and thus filed suit.

In the interest of clarity, the Court offers the following timeline of key events.[1] The story unfolded as follows:

| | |
|---|---|
| May 9 | Brinley and Yunhua (seller) sign the Letter of Intent for Brinley to buy the plane for $50 million[2] |
| May 9–10 | Brinley and Bonkoungou (buyer) sign the Offer Letter for Brinley to sell the plane to Bonkoungou for $57 million[3] |
| June 25–27 | Dusek communicates with Yunhua about possibly buying the plane[4] |
| July 1–4 | Brinley and Yunhua sign the Sale and Purchase Agreement for Brinley to buy the plane for $50 million[5] |
| July 1 | Brinley and Bonkoungou negotiate – but do not sign – a possible Sale and Purchase Agreement |
| July 20 | Dusek offers to sell the plane to Bonkoungou for $50 million |
| July 28 | Brinley's counsel sends the Cease and Desist Letter[6] |
| July 28–31 | Dusek communicates with Yunhua about the Cease and Desist Letter[7] |

---

[1] The statements of facts do not always go in chronological order, which interferes with the storytelling. *See* Pls.' Statement of Additional Facts (Dckt. No. 78). For example, Plaintiffs' Statement of Facts goes from July 1 (*id.* at ¶ 9), to June 25 (*id.* at ¶ 16), to August 2 (*id.* at ¶ 27), to July 19 (*id.* at ¶ 28), to August 4 (*id.* at ¶ 29), to July 28 (*id.* at ¶ 32), to July 20 (*id.* at ¶ 34). Plaintiffs organized their facts topically, rather than chronologically. But the end result was a herky-jerky story, requiring the reader to make his or her own timeline just to follow along.

[2] *See* Letter of Intent (Dckt. No. 80-4).

[3] *See* 5/9/18 Offer Letter (Dckt. No. 80-5).

[4] *See* 6/25/18, 6/26/18, 6/27/18 Emails (Dckt. No. 80-18).

[5] *See* 7/4/18 SPA (Dckt. No. 80-12); SPA Signature Page (Dckt. No. 80-10) (showing the signature by Brinley).

[6] *See* Cease and Desist Letter (Dckt. No. 49-2, at 12 of 29).

[7] *See* 7/28/18, 7/31/18 Emails (Dckt. No. 49-2, at 11–20 of 29).

| August 3 | Brinley and Bonkoungou sign a new Offer Letter for Brinley to sell the plane to Bonkoungou for $48 million[8] |
| August 4 | Dusek offers to sell the plane to Bonkoungou for $46 million[9] |
| August 6 | Dusek ends his efforts to buy and sell the plane |
| August 23 | Brinley and Yunhua sign the second Sale and Purchase Agreement for Brinley to buy the plane for $46 million[10] |
| August 30 | Visual inspection of the plane by Bonkoungou |
| August 31 | Yunhua rejects a lower price, and the negotiations end[11] |

The record consists largely of documents, including emails, draft agreements, and so on. There are only three depositions: Alireza Ittihadieh (principal of the Plaintiffs), John Dusek (Defendant), and Fred Meyer (an attorney for an advisor to the buyer). There isn't testimony from the seller or the buyer themselves, presumably because they live abroad. So, there isn't much in the record to show why they did what they did, except what is stated in the documents.

With that sneak peek of what's to follow, the Court dives into the record.

## I. The Parties

The parties are airplane brokers. They are "engaged generally in the business of aircraft sales and brokerage." *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 7 (Dckt. No. 79). Basically, they find airplanes that are for sale, buy them, sell them, and pocket the difference as profit. They flip planes.

Brinley and Freestream are the Plaintiffs. The same person, Alireza Ittihadieh, is behind each entity. *Id.* at ¶ 2. Ittihadieh is Brinley's sole beneficial owner, and is the sole beneficial

---

[8] *See* 8/3/18 Offer Letter (Dckt. No. 80-36, at 4 of 11).
[9] *See* 8/4/18 Email (Dckt. No. 80-38).
[10] *See* 8/23/18 SPA (Dckt. No. 80-35).
[11] *See* 8/31/18 Emails (Dckt. No. 80-41).

owner, CEO, President, and Director of Freestream. *Id.* at ¶¶ 2, 4. Brinley is a Panamanian corporation, and Freestream is a Bermudan corporation. *Id.* at ¶¶ 1, 3.

The parties don't explain the relationship between Brinley and Freestream, except their common ownership. Brinley's only business is trading aircraft. *Id.* at ¶ 2. It appears that Brinley may be a holding company (meaning the entity that owns the planes), and Freestream may be the broker. *See* Am. Cplt., at ¶ 23 (Dckt. No. 23). For present purposes, Brinley is the key player, because the agreements and draft agreements in question involved Brinley.

Freestream is a bit player in the story (at best) as told by the parties. Defendants' Rule 56.1 statement barely mentions Freestream. *See* Defs.' Statement of Facts, at ¶¶ 3, 4, 32 (Dckt. No. 49). Plaintiffs' Rule 56.1 statement mentions Freestream only once. *See* Pls.' Statement of Additional Facts, at ¶ 1(c) (Dckt. No. 78). Plaintiffs stated that Brinley would "share the $7 million profit with Freestream," but cited no evidence. *Id.*

RSH Aviation and John Dusek are the Defendants. RSH Aviation is an aircraft services company based in Illinois. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 79); *see also* RSH Aviation, www.rshair.com (last visited on January 20, 2022). John Dusek is its sole owner and representative. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 6.

The would-be seller is Yunhua Corporate Jet Leasing Designated Activity Company and its affiliate, ICBC Financial Leasing, Co., Ltd. (it sometimes goes by "ICBC," and sometimes goes by "ICBCFL"). *Id.* at ¶ 11. They are entities in China. Yunhua was the owner of the plane at the center of this case. *Id.* Yunhua and ICBC negotiated with both Brinley (Plaintiff) and RSH (Defendant) for the sale of the plane. *Id.*

The would-be buyer is Mahamadou Bonkoungou. He is the principal of several affiliated entities, including Alti Management Ltd., Bolti Management Ltd., Molti Management Ltd., and

Liza Transport International ("LTI"). *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 6 (Dckt. No. 82).[12]  Bonkoungou was the proposed end buyer of the plane, first through Alti and then through Bolti. *Id.*; *see also* Defs.' Statement of Facts, at ¶¶ 18, 22, 25 (Dckt. No. 49). Bonkoungou and his companies are based in Burkina Faso. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 6.

The last character is the airplane itself.  The plane in question was an Airbus A319.  That model is a "member of the Airbus A320 family of short- to medium-range, narrow-body, commercial passenger twin-engine jet airliners manufactured by Airbus." *See* Airbus 319, Wikipedia, https://en.wikipedia.org/wiki/Airbus_A319 (last visited on January 20, 2022).  Based on a quick internet search, it appears that many commercial airlines – United, Delta, American, and so on – fly this type of plane.

But the airplane in question was a souped-up, tricked-out model, for high-rollers.  The record shows the floorplan, which was completely different than the rows of narrow seats offered on commercial flights.  It had a large executive seating area, an office, a relaxing lounge, a special area for guests, and so on. *See* Floor Plan (Dckt. No. 49-4, at 53 of 105).

At the end of the day, no sale ever took place.  Yunhua did not sell to anyone, and Bonkoungou did not buy from anyone.  The question at hand is why Brinley's attempted deals fell through, and whether a jury could find Defendants responsible based on this record.

---

[12]  Defendants disputed the notion that Bonkoungou was the principal of the entities in question, claiming that Plaintiffs offered no supporting evidence. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 6 (Dckt. No. 82).  But the deposition testimony cited by Plaintiffs is sufficient to establish that the companies in question were Bonkoungou's companies.  In their Statement of Facts, Defendants admitted that Bonkoungou was the end buyer. *See* Defs.' Statement of Facts, at ¶ 22 (Dckt. No. 49); *see also id.* at ¶¶ 18, 25.

## II.     The Letter of Intent between Brinley (Broker #1) and Yunhua (the Seller)

The story begins in the spring of 2018, when Brinley started negotiating to buy and sell the airplane.  *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 2 (Dckt. No. 82). Within a matter of days, Brinley laid the groundwork for a possible purchase of the plane from Yunhua, and a possible sale to Bonkoungou.  Specifically, Brinley signed two agreements:  a Letter of Intent with Yunhua (the seller), and an Offer Letter with Bolti (the buyer, and one of Bonkoungou's companies).  *See* Letter of Intent (Dckt. No. 80-4); 5/9/18 Offer Letter (Dckt. No. 80-5).

Brinley and Yunhua executed the Letter of Intent on May 9, 2018.  *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 12 (Dckt. No. 79); Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 3 (Dckt. No. 82); *see also* Letter of Intent (Dckt. No. 80-4).  Brinley "hereby offer[ed] to purchase all rights and interests in an Airbus ACJ319 . . . from Yunhua . . . subject to the following terms and conditions."  *See* Letter of Intent.  The price was $50 million.  *Id.* at § 1.

The Letter of Intent included a number of conditions.  One of the conditions was a visual inspection by the buyer (defined as Brinley) (so, it's not a visual inspection by the *end* buyer, meaning Bonkoungou).  *Id.* at § 3.  It required a $2 million deposit, too.  *Id.* at §§ 8, 9.

Another condition was the execution of a Sale and Purchase Agreement within 15 days of payment of the deposit.  "The obligation of BUYER hereunder is subject to the execution of a mutually acceptable definitive Sale and Purchase Agreement by the parties.  The parties shall have a period of fifteen (15) business days after the payment of the Deposit to negotiate and execute a definitive Sale and Purchase Agreement."  *Id.* at § 6.

The Letter of Intent expressly stated that it was "non-binding," with a few exceptions.  *Id.* at § 15.  "The parties agree and acknowledge that this Letter of Intent constitutes a non-binding

letter of intent and except for the provisions regarding Deposit, Confidentiality, Governing Law and Jurisdiction, Termination and this section, which the parties agree create legal and binding obligations, does not and is not intended to create any legal obligation or enforceable right in any party." *Id.*

And again: "By executing this Letter of Intent, the parties are not obligated to execute the Sale and Purchase Agreement or proceed with or otherwise consummate the transaction." *Id.*

Yunhua received the $2 million deposit.[13] In the weeks that followed, Brinley and Yunhua negotiated the Sale and Purchase Agreement ("SPA"), exchanging drafts. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 4 (Dckt. No. 82).

## III. The Offer Letter between Brinley (Broker #1) and Bonkoungou (the Buyer)

Meanwhile, Brinley was negotiating the other side of the would-be deal, too. While it was negotiating to *buy* the airplane from Yunhua, Brinley was negotiating to *sell* the airplane to Bonkoungou.

On May 9, 2018, Brinley received a signed offer letter from Bonkoungou (technically, from Bolti Management, one of his companies). *See* Pls.' Resp. to Defs.' Statement of Facts, at

---

[13] Brinley states that it paid the deposit. *See* Pls.' Statement of Additional Facts, at ¶ 3 (Dckt. No. 78) ("On May 10, Yunhua received confirmation of Brinley's $2 million deposit on the purchase of the A319 from Insured Aircraft Title Service ('IATS')."). Brinley cited deposition testimony, and a Deposit Confirmation. *Id.*; *see also* Deposit Confirmation (Dckt. No. 80-7) (confirming receipt of $2 million as a deposit on the aircraft). In response, Defendants quibbled. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 3 (Dckt. No. 82) ("Plaintiffs have cited no admissible evidence in the record establishing that 'Yunhua received' the purported 'Deposit Confirmation' . . . . Defendants further dispute that Brinley ever actually paid the $2 million deposit."). Defendants devoted two paragraphs to this subject, pointing out that Yunhua did not receive the $2 million payment directly from Brinley. *Id.* Instead, Brinley assigned $1 million that it had in escrow with IATS, and borrowed $1 million from a third party. *Id.* What difference does it make where the money came from? Brinley never said that the money came directly from *Brinley*, so the clarification served no useful purpose. Either Yunhua received the $2 million deposit, or it didn't. And here, there appears to be no genuine issue of material fact that it did. This quibble is another good example of unnecessary quibbling, which achieved nothing other than complicating the Court's review. The Rule 56.1 statements became the battleground for trench warfare, fighting about every square inch on the field of battle.

¶ 12 (Dckt. No. 79); Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 1(b) (Dckt. No. 82).

Bonkoungou offered to buy the plane for $57 million. *See* 5/9/18 Offer Letter (Dckt. No. 80-5)

("We (the Buyer) refer to our recent discussions and are pleased to submit an offer to purchase

from you (the Seller) the Aircraft for a price of fifty seven million United States Dollars

(US$57,00,000.00) on the terms and conditions of this letter, including the terms and conditions

in annex 1 to this letter (the Offer)."). Brinley signed the offer letter on May 10. *Id.* at 2.

      The Offer Letter contained a number of terms and conditions. *Id.* at 1–2. It required a

deposit,[14] and a visual inspection. *Id.* It required a definitive Sale and Purchase Agreement, too.

*Id.* at 1 ("This Offer . . . is subject to the negotiation and entering into of a definitive Aircraft

Sale and Purchase Agreement in respect of the sale of the Aircraft by the Seller and its purchase

by the Buyer . . . ."). It set a deadline of June 5, 2018 to finalize the Sale and Purchase

Agreement. *Id.*; *see also id.* at 2 ("In case the Sale Agreement is not entered into by the

Documentation Deadline for any reason whatsoever (including the Buyer's decision not to

proceed with the transaction following the Visual Inspection), the Deposit shall be refunded to

the Buyer . . . and the parties shall be released from any obligation or liability under this letter.").

      In the weeks that followed, Brinley and Bonkoungou negotiated the terms of a Sale and

Purchase Agreement.[15] *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 7 (Dckt. No.

82). But they never signed one.

---

[14] There is nothing in the record showing that Bonkoungou did, in fact, pay the $2 million deposit. The record does include a letter from Bonkoungou dated June 6, 2018, apologizing for the delayed payment. *See* 6/6/18 Letter (Dckt. No. 80-13). In their Statement of Additional Facts, Plaintiffs contend that Bonkoungou "took steps toward making his deposit." *See* Pls.' Statement of Additional Facts, at ¶ 7 (Dckt. No. 78).

[15] Again, for the sake of clarity, the Court is simplifying the terminology. As a technical matter, Brinley dealt with Fred Meyer, who was counsel for Global Jet Monaco, who was "advising the final buyer." *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶¶ 8, 9 (Dckt. No. 82). Alireza Ittihadieh (the principal of Brinley) never spoke with Bonkoungou, the end buyer. *See* Ittihadieh Dep., at 26:16 – 27:13, 74:16-24 (Dckt. No. 80-3).

IV.     **The Dealings between RSH Aviation (Broker #2) and Yunhua (the Seller)**

Brinley wasn't the only broker who was interested in buying and reselling that plane.
While Brinley was busy negotiating with Yunhua and with Bonkoungou, Defendant John Dusek
(again, the principal of RSH) got wind of the fact that an airplane was for sale. So he reached
out to explore a possible opportunity.

At some point (the exact timing seems up in the air), John Dusek heard about a deal for a
plane that was falling through. He heard it from someone named Moussa Diarra. The parties
fiercely debate whether Diarra was affiliated with Bonkoungou.[16] But for now, the point is
simply that Diarra flagged the demise of a potential deal. And Dusek spotted an opening.

Diarra told Dusek that a deal was "cratering" on an airplane. *Id.* at ¶ 12; *see also* Dusek
Dep., at 113:4-20, 114:17 – 115:14 (Dckt. No. 80-1).

At deposition, Dusek offered the following description of what Diarra said: "You know,
there's an airplane – there's a deal cratering or they rejected an airplane, guys are looking for –
some guys – these guys, this group here is looking for a – a large aircraft, and they rejected this.
Do you – do you know any." *See* Dusek Dep., at 113:11-17 (Dckt. No. 80-1). Diarra told Dusek
that a deal had recently cratered for a group that he worked with in Africa. *Id.* at 114:17 – 115:1.

Diarra shared information about why the deal was cratering, too. Diarra told him that the
plane was rejected because it was "too expensive." *Id.* at 120:9-14, 122:5-23. The price was "in

---

[16] Plaintiffs cite evidence for the notion that Diarra was an employee of LTI, Ltd., meaning one of
Bonkoungou's companies. *See* Pls.' Statement of Additional Facts, at ¶¶ 6, 13 (Dckt. No. 78); *see* Meyer
Dep., at 11:21-23 (Dckt. No. 80-2) (explaining that LTI is the aviation company in "Bonkoungou's
group"). So Plaintiffs view Diarra as Bonkoungou's agent. At deposition, Dusek testified that Diarra
didn't reveal what his connection was with the end buyer. *See* Dusek Dep., at 124:18 – 127:11 (Dckt. No.
80-1). Diarra's exact status – and whether Dusek *knew* that status – seems immaterial. According to the
testimony, Diarra told Dusek that a potential deal to sell an airplane was cratering. There's no evidence
that Diarra told Dusek that anyone had exclusive rights to buy the airplane.

the high 50s, 50 millions." *Id.* at 122:12-15. Dusek floated a potential sale price of "close to 50 million," and Diarra responded: "that might fly." *Id.* at 124:5-13.

That conversation took place before Dusek reached out to Yunhua (on June 25, as explained below). *Id.* at 117:12 – 118:2. So, Dusek "scoured the Internet" and tried to find the opportunity. *Id.* at 113:21.

At some point in June 2018, John Dusek saw an advertisement for the sale of an Airbus A319 on AMSTAT, an industry-standard internet platform. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 30 (Dckt. No. 79). As Dusek remembers it, the advertisement identified Yunhua as the seller. *Id.* at ¶ 31. The listing also identified a broker who was involved in the deal, but it was not Brinley or Freestream. *Id.* at ¶ 32. The listing stated that it was "non-exclusive," meaning that the broker did not have exclusive rights to negotiate a sale of the airplane. *Id.*

After reading the advertisement, Dusek contacted ICBC (again, Yunhua's affiliate) on June 25, 2018. *Id.* at ¶ 33. He expressed an interest in buying the plane. *Id.* He sent an email saying that he had an "acquisition agreement for a Bahamian A319CJ client." *See* 6/25/18 Email (Dckt. No. 80-18, at 3 of 4).

ICBC responded that it was in discussions with an unidentified potential purchaser, but it had not signed a purchase agreement. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 34 (Dckt. No. 79); *see also* 6/25/18 Email (Dckt. No. 80-18, at 2 of 4) ("Currently we are negotiating with another client but the purchase agreement has not been signed yet.").

The next day, June 26, 2018, Dusek requested photos of the Airbus and asked for the price. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 35 (Dckt. No. 79); *see also* 6/26/18 Email (Dckt. No. 80-18, at 2 of 4). ICBC responded that it was nearing a deal with another buyer. But ICBC invited Dusek to make an offer, too: "The current ongoing transaction is

12

expected to have a result within two weeks. I will let you know if the aircraft is formally released for sale again. As for the price, if you are interested in the aircraft, *please make offer*."[17] *See* 6/26/18 Email (emphasis added).

On June 27, 2018, Dusek sent ICBC a term sheet / letter of intent for the airplane. *See* 6/27/18 Email (Dckt. No. 80-18, at 1 of 4). ICBC responded: "Thanks for your quick reply. We will review your term sheet." *Id.* But once again, ICBC pointed to ongoing negotiations with another interested buyer. "Sorry that we cannot give you feedback and discuss with you in depth now as we are in negotiation with another client. I will come back to you once the aircraft is available for sale again." *Id.*

## V. The Sale and Purchase Agreement between Brinley (Broker #1) and Yunhua (the Seller)

In the meantime, Brinley and Yunhua continued to negotiate a Sale and Purchase Agreement. (Recall that Brinley and Yunhua signed a Letter of Intent in May 2018.)

They reached a deal in early July. Brinley signed the Sale and Purchase Agreement on July 1, 2018. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 5 (Dckt. No. 82); *see also* SPA Signature Page (Dckt. No. 80-10). Yunhua sent a signed version of the Sale and Purchase Agreement to Brinley on July 4, 2018.[18] *See* Pls.' Resp. to Defs.' Statement of Facts,

---

[17] It is worth pausing to give the reader a taste of the gratuitous obstruction by Plaintiffs when it comes to the Statement of Facts. Plaintiffs wrote: "Plaintiffs dispute the characterization that ICBC 'requested an offer.'" *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 35 (Dckt. No. 79). But in its email dated June 26, 2018, ICBC wrote: "*please make offer*." *See* 6/26/18 Email (Dckt. No. 80-18, at 2 of 4) (emphasis added).

[18] RSH Aviation takes opposing positions on this point in its filings. In its Response to Plaintiffs' Additional Facts, RSH disputes the notion that Yunhua ever signed the Sale and Purchase Agreement. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 5 (Dckt. No. 82) ("Defendants object to the statement that 'Yunhua executed' the SPA because Plaintiffs have cited no admissible evidence in the record establishing the foundation as to whether Yunhua executed the document."). But in its *own* Statement of Facts, RSH admits that Yunhua signed it: "On July 4, 2018 Yunhua sent to Brinley an executed signature page for an Aircraft Sale and Purchase Agreement." *See* Defs.' Statement of Facts, at ¶ 16 (Dckt. No. 49). The Court deems that fact admitted. So, for purposes of summary judgment, all parties agree that Yunhua signed the Sale and Purchase Agreement with Brinley.

at ¶ 16 (Dckt. No. 79); *see also* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 5. So, on July 4, they had a signed agreement.

In that agreement, Yunhua agreed to sell the airplane to Brinley for $50 million. *See* SPA, at § 1.1 (Dckt. No. 80-12) (defining the "Purchase Price" as $50 million); *id.* at § 2.1 ("For and in consideration of the Purchase Price, on the Closing Date, Seller shall sell and deliver the Aircraft to Purchaser . . . on and subject to the terms and conditions set forth herein."); *see also* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 5 (Dckt. No. 82).

Yunhua also agreed to take the plane off the market. "Upon execution of this Agreement, the Aircraft shall be removed from the market and Seller shall not enter into any agreement or discussions to sell or lease the Aircraft to any person other than Purchaser or authorize or permit any adviser or agent acting on behalf of Seller to do any of the same until the termination of this Agreement in accordance with the terms and conditions herein." *See* SPA, at § 2.4 (Dckt. No. 80-12).

But once again, there were conditions. The deal was contingent on a visual inspection, which needed to take place by July 6, 2018 in the Ivory Coast. *Id.* at § 3.1.1. That's two days after execution. And that visual inspection did not happen. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 21 (Dckt. No. 79).

## VI.     The Lack of a Sale and Purchase Agreement between Brinley (Broker #1) and Bonkoungou (the Buyer)

So, by early July 2018, Brinley had buttoned down the terms of a Sale and Purchase Agreement with Yunhua, the seller. But Brinley was still working on a Sale and Purchase Agreement with Bonkoungou, the buyer.

In early July 2018, the attorneys for Brinley and Bonkoungou were continuing to negotiate the terms of a Sale and Purchase Agreement. On July 1, 2018, counsel for the buyer

sent an email to counsel for Brinley, circulating a new draft.[19] Optimism was in the air: "Thank you for the revised draft. It seems we are almost there." *See* 7/1/18 Email (Dckt. No. 80-14).

Later that day, Brinley's counsel received additional changes from Bonkoungou's counsel, and then circulated a new draft agreement with additional changes. "I made a few wording adaptations which should not be controversial. . . . If you agree with the attached, I will prepare a translation to the client on this basis, hoping to receive his green light by tomorrow morning (your point that the flight costs need to be paid tomorrow is well noted)." *See* 7/1/18 Email (Dckt. No. 80-15, at 2 of 2).

But they didn't quite get there. Brinley and Bonkoungou never signed a Sale and Purchase Agreement. The record includes a draft agreement, which is unsigned. *See* 8/3/18 Draft Sale and Purchase Agreement (Dckt. No. 80-37). Bonkoungou apparently pulled out on July 2. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 11 (Dckt. No. 82).

In the end, the sale from Brinley to Bonkoungou did not go forward. *Id.* The parties argue about why the sale did not go through.[20] Put the reasons aside for now. For present purposes, the key thing is that Bonkoungou backed out and did not buy the airplane. *Id.*

---

[19] Again, the email in question came from Meyer. In their response to Plaintiffs' Rule 56.1 statement, Defendants repeatedly dispute the notion that Meyer was counsel for the end buyer. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶¶ 8, 9 (Dckt. No. 82). Defendants point out that Meyer represented Global Jet Monaco, who was "*advising* the final buyer." *Id.* (emphasis added). Fair enough. It makes no difference. Meyer was exchanging drafts on behalf of the buyer's side of the deal.

[20] Brinley claims that the deal fell through because "someone interfered with the deal by offering the same plane for less money." *See* Pls.' Statement of Additional Facts, at ¶ 11 (Dckt. No. 78). As support, Brinley offers hearsay, wrapped with speculation. *Id.* Brinley relies on the testimony of Alireza Ittihadieh, who heard it from Mike Savary, who heard it from Bonkoungou. *Id.*; *see* Ittihadieh Dep., at 74:3-7 (Dckt. No. 80-3) ("Because we didn't have a deal until July, because we had – *we had some sort of interference. We didn't know where it came from.* And Mr. Bonkoungou Mahamadou told Mike Savary that he's been offered the same airplane for less money.") (emphasis added); *id.* at 82:9-13 ("[A]nd then Mike, again, called me. He said, 'Look, *it seems like there is something going on*, and we are – we're being – *somebody is interfering* with our deal.'") (emphasis added); *id.* at 82:16, 19-22 ("So then Mike went to Paris to see him. . . . And Mike called me, and he said, 'He's telling us – telling me that he has been offered the same airplane by another broker for substantially less.' And he mentioned the number 50."). Ittihadieh never heard the reason from Bonkoungou himself. In fact, Ittihadieh testified that he has

## VII.  The Dealings between RSH (Broker #2) and Bonkoungou (the Buyer)

A few weeks later, RSH offered to sell the airplane to Bonkoungou.  On July 20, 2018, RSH offered to sell the Airbus A319 to Bonkoungou for $50 million.  *Id.* at ¶ 34.  The parties don't provide much backstory on this chapter, and if the offer is in the record, the parties don't cite it.[21]

Putting that price in perspective, recall that Brinley had offered to sell the plane to Bonkoungou on May 9, 2018 for $57 million.  *See* 5/9/18 Offer Letter (Dckt. No. 80-5).  So Dusek's sale price ($50 million) was $7 million less than Brinley's sale price ($57 million).

## VIII.  The Cease and Desist Letter

The competing attempts to buy and sell the airplane eventually collided.  On July 28, 2018, Brinley's counsel (Boies Schiller Flexner LLP) sent a cease and desist letter to RSH.  *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 39 (Dckt. No. 79); Cease and Desist Letter (Dckt. No. 49-2, at 11–12 of 29).

The Cease and Desist Letter claimed that "Brinley has the benefit of the exclusive right to purchase the Aircraft from Yunhua under the terms of a sale and purchase agreement.  Brinley also has a signed offer and acceptance letter from an onward purchaser."  *See* Cease and Desist Letter (Dckt. No. 49-2, at 12 of 29).

Brinley's counsel accused RSH of interfering.  "Brinley has discovered that RSH Aviation/ RSH Air ('RSH') and/or individuals affiliated to RSH are, without any reasonable basis, seeking to interfere with Brinley's business relationships with these counterparties in order to divert business from Brinley to RSH.  If such interference causes the onward sale of the

"[n]ever spoken to him.  I reiterate, sir, for the record, I have never, ever spoken to Mr. Bonkoungou." *Id.* at 74:22-24.

[21]  The parties do not appear to have provided the backstory in their statements of facts.  But it is easy to get lost in the impenetrable forest that is the Rule 56.1 statements filed by these parties.

Aircraft to fall through, it will cause Brinley significant loss and damage, for which Brinley will hold RSH and/or its affiliated individuals responsible." *Id.*

Brinley's counsel demanded a response within two days, seeking confirmation that RSH would "immediately cease all interference with Brinley's business relationships in respect of the Aircraft." *Id.* For good measure, Brinley threatened imminent legal action. *Id.*

Counsel for RSH immediately forwarded the Cease and Desist Letter to ICBC (the seller's affiliate), and requested an explanation. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 79); 7/29/18[22] Email (Dckt. No. 49-2, at 11 of 29). RSH's counsel assumed that the Cease and Desist letter was a mistake. "[O]ur client received the below email. I presume the sender is mistaken. I would not expect that your team would have executed an exclusive arrangement, but continued to negotiate with our client. Please confirm that our negotiations are valid and confidential." *See* 7/29/18 Email.

ICBC responded right away. And it assured RSH that their negotiations were legitimate. "We will consult with the legal counsel and deal with the untrue accuse [sic]. Our negotiation is valid and confidential." *See* 7/28/18 Email (Dckt. No. 49-2, at 11 of 29).

RSH's counsel expressed thanks for the confirmation. "[T]hank you for your and your client's assurance. I will advise my client to disregard and not respond to the communication." *See* 7/29/18 Email (Dckt. No. 49-2, at 17 of 29).

RSH received reassurances from the seller's counsel, too. The seller's attorney responded that the Cease and Desist Letter was mistaken. In fact, the seller's counsel encouraged RSH to stay involved and keep negotiating. "Any and all suggestions and accusations in Boies Schiller Flexner's ('BSG') [sic] email dated 28 July are hereby expressly

---

[22] The dates of the emails go back and forth between July 28 and 29, presumably because of the time differences when emailing internationally.

rejected and denied. *Please continue with the transaction*." *See* 7/28/18 Email (Dckt. No. 49-2, at 14 of 29) (emphasis added).

Apparently, Brinley or its counsel continued to make noise to RSH about interference. So, on July 31, 2018, counsel for RSH reached out to counsel for Yunhua/ICBC, and asked that they contact Brinley's counsel and clear things up. *See* 7/31/18 Email (Dckt. No. 49-2, at 17 of 29).

"[U]nfortunately my client continues to be harassed by the party claiming to have exclusive rights to the aircraft. I would ask that your firm contact BSG [sic], and demand that their client cease any communication or representation related to the aircraft. If Brinley Holdings continues to make these statements in the marketplace, it will become very difficult to re-market your client's aircraft." *Id.*

That same day, counsel for Yunhua/ICBC responded by email and provided a timeline of the negotiations between Yunhua/ICBC and Brinley. *See* 7/31/18 Email (Dckt. No. 49-2, at 16 of 29). The punchline was that, according to counsel for Yunhua/ICBC, Brinley's Cease and Desist Letter was off base.

The timeline showed that Brinley and Yunhua had signed a non-binding letter of intent. But they never agreed to a Sale and Purchase Agreement (according to the email, that is). Specifically:

> 1. The owner of the captioned aircraft, Yunhua . . . entered into a Letter of Intent dated 9 May 2018 with Brinley Holdings Inc, whereby Yunhua agreed to sell the captioned aircraft to Brinley. However, this LOI was ***expressly non-binding*** and was ***expressly subject*** to the parties entering into a formal sale and purchase agreement
>
> 2. . . . [T]he parties ***were never able to agree on the SPA***[23]

---

[23] As an aside, the Court does not fully understand the statement by ICBC's counsel that Brinley and Yunhua were "never able to agree on an SPA." *See* 7/31/18 Email (Dckt. No. 49-2, at 16 of 29). Brinley

3.      . . . [W]hilst, according to the LOI, Yunhua is obliged to remove the aircraft from market only upon the signing of the SPA, our client has on 15 May decided on an ex gratia basis to remove the aircraft from market, on the express condition that the SPA is signed within 15 business days

4.      On 19 July, ICBCFL wrote to Brinley's broker to the effect that, given that the transaction was not proceeding as contemplated, ICBCFL would resume marketing the aircraft[24]

5.      On 28 July, Brinley's transaction lawyer made some counter offers on major terms of the SPA[.]

*Id.* (emphasis added).

The seller's attorney took issue with the key premise of the Cease and Desist Letter from Brinley's counsel – *i.e.*, the notion that Brinley had exclusive rights to the airplane. "Due to the events set out above, we understand that at the time BSF [Boies Schiller Flexner, Brinley's counsel] wrote to RSH Air, ICBCFL had not entered into any binding agreement to sell the aircraft to Brinley, nor is Brinley entitled to any exclusive rights to purchase the aircraft legally, and at the time BSF wrote to RSH Air, Brinley was made aware that ICBCFL had already resumed marketing the aircraft." *Id.*

---

signed the Sale and Purchase Agreement on July 1, 2018, and Yunhua signed it on July 4. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 5 (Dckt. No. 82); *see also* SPA Signature Page (Dckt. No. 80-10). But the parties don't put any significance on the fact that ICBC's counsel may have gotten this point wrong. It may not matter. For present purposes, the important thing is what Dusek knew at the time. And the seller's counsel told him that there was no Sale and Purchase Agreement.

[24] Plaintiffs' book of exhibits includes an email exchange between ICBC and Brinley on July 19, which may or may not be the correspondence that ICBC's counsel mentioned in her email on July 31. *See* 7/19/18 Emails (Dckt. No. 80-17). ICBC expressed frustration at the slow pace: "Another half month has passed by but no real progress was made. We have removed the Aircrafts from the market for two months at the request of the buyer even though we are not obliged to do so. In view of the current situation, we understand that the buyer may need to re-consider their offer and thus the transaction would not be able to take place in the original timeframe." *Id.* The email exchange is potentially significant given that it came after the signing of the Sale and Purchase Agreement (between Brinley and Yunhua) on July 4, and before the Cease and Desist Letter on July 28. But the parties don't discuss this email exchange in any level of detail.

The seller's counsel reported that she had told *Brinley* to stop interfering. "On 29 July, after receiving the email from you regarding BSF's email to RSH Air and at the instruction of ICBCFL, we wrote to Brinley's transaction lawyer in the US and Brinley's broker, formally confirming the termination of our negotiation with Brinley and requesting Brinley to cease interfering with ICBCFL/Yunhua's negotiation with other counterparties." *Id.*

In sum, according to the seller's counsel, RSH wasn't interfering with anything, because there was nothing to interfere *with*. "Due to the events above, we understand that the previous transaction between ICBCFL and Yunhua[25] has already been formally terminated, and we would like to reiterate our position that any and all suggestions and accusations in BSF's email dated July 28 [*i.e.*, the Cease and Desist Letter] are expressly rejected and denied." *Id.*

## IX.  RSH's Continuing Negotiations with the Seller and the Buyer

After receiving the response from Yunhua, RSH continued to negotiate with the seller and the buyer. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 33 (Dckt. No. 82). So did Brinley.

On August 3, 2018, Brinley signed a new Offer Letter with one of Bonkoungou's companies (Alti). *See* 8/3/18 Offer Letter (Dckt. No. 80-36, at 4–5 of 11). Brinley offered to sell the plane for $48 million. *Id.* So the price fell from $57 million on May 9 to $48 million on August 3. *See* 5/9/18 Offer Letter (Dckt. No. 80-5); 8/3/18 Offer Letter.

The letter contained some familiar terms. As before, the offer was "subject to the negotiation and entering into of a definitive Aircraft Sale and Purchase Agreement in respect of the sale of the Aircraft by the Seller and its purchase by the Buyer including the terms and

---

[25]  That phraseology seems to be a mistake. A "transaction between ICBCFL and Yunhua" is a transaction between the seller and the seller. (Recall that ICBC is Yunhua's affiliate.) Maybe counsel meant a "transaction between Brinley and ICBC/Yunhua." But the parties don't explain it, or discuss it.

conditions in Annex 1 to this letter and otherwise in form and substance satisfactory to the Seller and the Buyer (the **Sale Agreement**) by August 10, 2018 (the **Documentation Deadline**)." *See* 8/3/18 Offer Letter (Dckt. No. 80-36, at 4 of 11) (emphasis in original). It required a deal by August 10. "In case the Sale Agreement is not entered into by the Documentation Deadline [defined as August 10] for any reason whatsoever (including the Buyer's decision not to proceed with the transaction following the Visual Inspection) . . . the parties shall be released from any obligation or liability under this letter." *Id.* at 2 (Dckt. No. 80-36, at 5 of 11).

The Offer Letter required a $3,000,000 deposit. *Id.* at 1 ("If the Buyer fails to transfer the Deposit to the Escrow Agent within the three (3) business days period stated above, this letter shall be deemed cancelled and the parties shall be released from any obligation or liability hereunder.").[26] And critically, the Offer Letter required a visual inspection. *Id.* at 1–2.

RSH continued its efforts to sell the plane to Bonkoungou, too. On August 4 (*i.e.*, the day after Brinley and Bonkoungou signed a new Offer Letter), RSH offered a lower price. RSH emailed a proposal to sell the airplane for $46 million, plus a $1 million transaction fee. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 39 (Dckt. No. 82); *see also* 8/4/18 Email (Dckt. No. 80-38) ("I am writing to your group to suggest a path forward regarding the sale of A319ACJ, SN 4228. . . . Final sale price . . . $46,000,000.00 U.S.").

But then RSH walked away. RSH ended its negotiations with ICBC on August 6, 2018. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 79). ICBC sent an email confirming that RSH had decided to call it off. "Further to our conversation earlier today, I understand that you would like to terminate the negotiation on A319 as the current situation is

---

[26] There does not appear to be any evidence in the record of Bonkoungou paying the $3 million deposit. If that's right, then the Offer Letter was, by its terms, "cancelled." *See* 8/3/18 Offer Letter, at 1 (Dckt. No. 80-36, at 4 of 11).

complex and uncertain. We respect your decision." *See* 8/6/18 Email (Dckt. No. 49-2, at 21 of 29); *see also* Dusek Dec., at ¶ 21 (Dckt. No. 49-2, at 4 of 29); 8/7/18 Letter (Dckt. No. 49-2, at 29 of 29).

After August 6, 2018, RSH did not negotiate with ICBC about potentially buying the airplane. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 47 (Dckt. No. 79). Presumably RSH told Bonkoungou, too, that it was no longer interested. But the record does not shed light on that part of the story.

The key point is that there's no evidence in the record that John Dusek and RSH did anything to try to buy or sell the plane after August 6.

## X.     Brinley's Second Attempt at a Deal

At that point, RSH had left the picture, but Brinley was still in the game. Brinley continued to try to buy and sell the airplane.

On August 23, 2018, Brinley and Yunhua entered into a second Sale and Purchase Agreement. *See* 8/23/18 SPA (Dckt. No. 80-35). They agreed on a lower price. Yunhua agreed to sell the airplane to Brinley for $46 million. *Id.* at § 1.1 (defining the "Purchase Price" as $46 million); *id.* at § 2.1 ("For and in consideration of the Purchase Price, on the Closing Date, Seller shall sell and deliver the Aircraft to Purchaser . . . on and subject to the terms and conditions set forth herein.").

On August 30, 2018, Bonkoungou himself inspected the aircraft in Paris, France. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 26 (Dckt. No. 79). Things didn't go smoothly. Bonkoungou demanded a $2,500,000 price reduction. *Id.* at ¶ 27.

22

Brinley was not surprised that the visual inspection led to a demand for a lower price. In fact, Brinley *anticipated* that Bonkoungou would demand a price reduction, and viewed it as a "negotiating tactic to further reduce the price of the Aircraft." *Id.*

Ittihadieh, Brinley's principal, acknowledged that visual inspections are critical because buyers often use them as a final negotiating tool. *Id.* at ¶¶ 15, 18, 20, 22, 23, 24, 27 (Dckt. No. 79); Ittihadieh Dep., at 65:15-18 (Dckt. No. 80-3). He testified:

> It is very important. Because a lot of the time they leave this as the last negotiating tool. They come up with – and especially from people from that part of the world, Middle East, Asia, Africa, they have a tendency of insisting on looking at the aircraft, and then turning and saying, "You know what? It's not – it's more used than I thought. You know, give me a better price." It was always – we expected it, and we are provisioned for it.

*See* Ittihadieh Dep., at 66:24 – 67:9.

Brinley understood that Bonkoungou had to be satisfied with the aircraft, or there was no deal. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 79); Ittihadieh Dep., at 95:23 – 96:3 (Dckt. No. 80-3); *see also* Ittihadieh Dep., at 48:3-6 ("[W]hen there is a visual as a condition, it's key. It's the – you know, everything – there's deposit and visual. If those two don't come together, there is no deal. So up to that very point, it is very premature.").[27]

After Bonkoungou demanded a price reduction, Brinley's deal with Yunhua began to unravel. Brinley told Yunhua that the buyer had demanded a price reduction. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 28 (Dckt. No. 79). But Brinley added that the would-be buyer still wanted the plane. *Id.*; *see also* 8/29/18 Email (Dckt. No. 80-43, at 1 of 12) ("The viewing took place at 2 pm in Paris earlier today. I can advise you that the principal would like to

---

[27] Later, Brinley contends that "Brinley's agreement with Bonkoungou *required* Bonkoungou to purchase the A319 from Brinley for $48 million, conditioning that obligation on Bonkoungou's satisfaction with the A319." *See* Pls.' Statement of Additional Facts, at ¶ 38 (Dckt. No. 78). But as support, Brinley cites an unsigned, draft agreement between Brinley and Bonkoungou. *Id.*

proceed to purchase the Aircraft[.] However, the Aircraft was not in a condition expected and he therefore is requesting a discount of $2.5 million.").

So Brinley asked Yunhua to lower the selling price. Brinley demanded a price reduction from the seller, totaling $1,750,000. It was a "best and final" offer. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 29 (Dckt. No. 79).

ICBC rejected the request for a price reduction on August 31. *Id.*; *see also* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 40 (Dckt. No. 82); 8/31/18 Emails (Dckt. No. 80-41). And, with that rejection, Brinley ended its efforts to buy and sell the plane.

Brinley blames the demise of the would-be deals on Defendants. As Brinley sees it, the deals crumbled because Defendants offered to sell the plane to Bonkoungou for only $46 million. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 40 (Dckt. No. 82). After hearing that low price, Bonkoungou was "no longer willing to pay a purchase price that would make the transaction economically viable." *Id.*

### Procedural History

Brinley and Freestream responded by filing suit against RSH and John Dusek. *See* Cplt. (Dckt. No. 1). The original complaint included four claims. They later filed an amended complaint, adding more claims.

The amended complaint includes eight counts. *See* Am. Cplt. (Dckt. No. 23). The first five claims allege tortious interference with contract. The last three claims allege tortious interference with prospective economic advantage.

The first two counts are about the Sale and Purchase Agreements between Brinley and Yunhua. Count I is a tortious interference with contract claim about the original Sale and Purchase Agreement between Brinley and Yunhua (from July 4). *Id.* at ¶ 51. Count II is a

24

tortious interference with contract claim about the second Sale and Purchase Agreement between Brinley and Yunhua (from August 23). *Id.* at ¶ 62.

The third and fourth counts are about the Sale and Purchase Agreement(s) between Brinley and Bonkoungou (or, more specifically, his company, Alti). Count III is a tortious interference with contract claim about the "Initial Brinley-Alti SPA." *Id.* at ¶ 73. Count IV is a tortious interference with contract claim about the "New Brinley-Alti SPA." *Id.* at ¶ 84. (Spoiler Alert: there was no Sale and Purchase Agreement between Brinley and Bonkoungou or his companies.)[28]

The fifth count is the last claim of tortious interference with contract. Count V is a tortious interference with contract claim about the "Freestream Brokerage Agreements," meaning agreements "between Brinley and Freestream." *Id.* at ¶¶ 95, 97.

The last three claims involve tortious interference with prospective economic advantage (not tortious interference with contract). Count VI is about Brinley's planned purchase of the plane from Yunhua and/or ICBC. *Id.* at ¶¶ 105, 106. Count VII is about Brinley's planned sale of the plane to Bonkoungou's companies (specifically, Bolti and/or Alti). *Id.* at ¶¶ 122, 123. Count VIII is about Brinley's plan to compensate Freestream for brokerage services for Brinley's purchase and sale of the plane. *Id.* at ¶¶ 139, 140.

Discovery followed, and Defendants later filed a motion for summary judgment.

---

[28] Count III is about the so-called "Initial Brinley-Alti SPA." *See* Am. Cplt., at ¶¶ 77–79, 82 (Dckt. No. 23). Count IV is about the so-called "New Brinley-Alti SPA." *Id.* at ¶¶ 84–90, 93. The record shows that Brinley and Alti (Bonkoungou's company) *negotiated* a potential Sale and Purchase Agreement, but did not come to terms. There was no signed contract. The non-existence of a Sale and Purchase Agreement between Brinley and Alti (or any of Bonkoungou's companies) is an independent ground for granting summary judgment to Defendants on Counts III and IV. A claim of tortious interference with contract requires the existence of a contract.

A little later, Plaintiffs opened a second legal front, filing a new lawsuit against Husch Blackwell, the law firm representing Defendants in this case. *See Brinley Holdings, Inc. et al. v. Husch Blackwell LLP et al.*, 19-cv-5242 (N.D. Ill.).

## Summary Judgment Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

Summary judgment is the time for the non-moving party to put its evidentiary cards on the table. Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up

moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). "A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'" *Caisse Nationale de Credit v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996).

The non-moving party cannot defeat a motion by offering speculation, conjecture, or unsupported theories of the case. A "mere scintilla of evidence" is not enough, either. *See Nat'l Inspection & Repairs, Inc. v. George S. May Intern. Co.*, 600 F.3d 878, 882 (7th Cir. 2010). The non-moving party cannot get to a jury by raising "some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation and internal quotation marks omitted).

## Discussion

Plaintiffs filed eight claims under Illinois law.[29] Specifically, Plaintiffs brought five claims of tortious interference with contract, and three claims of tortious interference with prospective economic advantage. The Court will take them up in that order.

### I. Tortious Interference with Contract

The first five claims by Brinley and Freestream allege tortious interference with contract. Claims one and two involve the Sale and Purchase Agreements with Yunhua. Claims three and

---

[29] The parties take it as a given that Illinois law applies. The Court will follow suit because that selection is reasonable (given that Defendants are from Illinois). *See Bowers v. Fed'n Internationale de l'Autombile*, 489 F.3d 316, 324 n.4 (7th Cir. 2007); *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 864 (7th Cir. 1999) ("The parties agree that the substantive issues in this diversity suit are governed by Illinois law, and we do not look behind such agreements so long as they are reasonable[.]"); *Christopoulos v. Trout*, 343 F. Supp. 3d 812, 817 n.3 (N.D. Ill. 2018) ("[T]he court need not conduct a choice of law analysis because the parties have not conducted one or advocated for applicability of the law of a state other than Illinois, resulting in waiver of choice of law."). As an aside, the contracts include choice-of-law provisions that invoke English law. But tortious interference is a tort that is "independent of choice-of-law provisions." *See Medline Indus., Inc. v. Maersk Med., Ltd.*, 230 F. Supp. 2d 857, 863 (N.D. Ill. 2003). No party advocates for applying English law here.

four involve contracts with Bonkoungou, including the (supposed) Sale and Purchase

Agreements. Claim five involves a brokerage agreement between Brinley and Freestream (*i.e.*,

the two Plaintiffs).

Under Illinois law, a claim of tortious interference with contract has five elements:

"(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and

unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by

defendant's wrongful conduct, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir.

2018); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 137 Ill. Dec. 19,

545 N.E.2d 672, 676 (1989).

A tortious interference claim is not a backdoor way to stifle competition. "Legitimate

competitive efforts, such as indicating interest in and making offers to acquire [an asset], are not

tortious interferences with business." *Feldman v. Allegheny Int'l, Inc*., 850 F.2d 1217, 1224 (7th

Cir. 1988). More than one buyer can pursue a deal with a seller. And another buyer can offer a

lower price, too. Other potential buyers can compete – but once there is a contract, they can't

intentionally induce a breach by the seller.

Plaintiffs' claims are rife with problems. Plaintiffs have not come forward with evidence

to support several essential elements of the claim. Each failure is an independent ground for

dismissal.

### A.     The Claims Involving Freestream

The Court begins with low-hanging fruit. Count V alleges that Defendants tortiously

interfered with a contract between Brinley and Freestream, meaning the two Plaintiffs. *See* Am.

Cplt., at ¶ 22 (Dckt. No. 23) ("[I]n a separate binding and enforceable agreement (the 'Initial

Freestream Brokerage Agreement'), Brinley agreed to pay $3,000,000 of its $7,000,000 profit to

28

Freestream in consideration of brokerage services Freestream rendered in connection with the arrangement and negotiation of the Initial Yunhua Agreements and the Initial Bolti Agreements."); *id.* at ¶ 95 ("Freestream had valid and enforceable contracts with Brinley, including the Freestream Brokerage Agreements.").

There is no evidence in the record that any such agreement ever existed. *See* Defs.' Mem. in Support, at 11 n.5 (Dckt. No. 48). In their Rule 56.1 statement, Plaintiffs mention Freestream only once. Paragraph one says that in "May of 2018, Plaintiffs arranged a transaction" to buy and sell the plane (for $50 million and $57 million, respectively), and that "Brinley would share the $7 million profit with Freestream." *See* Pls.' Statement of Additional Facts, at ¶ 1(c) (Dckt. No. 78). Plaintiffs offered no evidence to support the latter point, that is, the existence of an agreement between Brinley and Freestream to share the profits.

As an aside, Alireza Ittihadieh (the principal of each entity) touched on this topic in passing during his deposition. (But Plaintiffs did not include this fact in their Rule 56.1 statement, let alone cite the testimony, so it doesn't count under the Local Rules. A statement of additional facts must include "[e]ach asserted fact," buttressed by "citation to the specific evidentiary material." *See* LR 56.1(b)(3), 56.1(d)(2). Here, Plaintiffs did neither.) When asked at deposition if there was a contract between Brinley and Freestream, Ittihadieh testified: "Oh, between myself and myself? Yeah, I agreed with myself I am going to act for Brinley." *See* Ittihadieh Dep., at 16:12-13 (Dckt. No. 16). He expanded on that non-responsive testimony a few questions later, saying that "we normally share the equivalent of a brokerage fee." *Id.* at 16:21-22; *see also id.* at 16:17-19 ("[B]ecause we use the resources of Freestream Aircraft (Bermuda), we would have probably shared the benefits to some point."). A loosey-goosey practice or plan is not the same thing as a contract.

29

The existence of a contract is an essential element of a claim of tortious interference with contract. *See Webb*, 906 F.3d at 577. There is no evidence in the record – meaning the facts supported by admissible evidence in the Rule 56.1 statements, as defined by the Local Rules – that Brinley and Freestream had a contract. So there is no claim.

And even then, there is no evidence in the record that Defendants had knowledge of any such contract. Knowledge is an essential element of the claim. *Id.* But once again, Plaintiffs come up empty.

For similar reasons, the first four claims – meaning the claims that Defendants tortiously interfered with contracts between Freestream and the seller (Yunhua) or the buyer (Bonkoungou) – fizzle too. There is no evidence in the record of any contract between Freestream and anyone.

The contracts in the record involved Brinley, not Freestream. The Letter of Intent dated May 9, 2018 was between Brinley and Yunhua. *See* Letter of Intent (Dckt. No. 80-4). The Offer Letter dated May 10, 2018 was between Brinley and Bolti (Bonkoungou's company). *See* 5/9/18 Offer Letter (Dckt. No. 80-5). The Sale and Purchase Agreement dated July 4, 2018 was between Brinley and Yunhua. *See* 7/4/18 SPA (Dckt. No. 80-12); SPA Signature Page (Dckt. No. 80-10) (showing the signature by Brinley). The Offer Letter dated August 3, 2018 was between Brinley and Alti (Bonkoungou's other company). *See* 8/3/18 Offer Letter (Dckt. No. 80-36, at 4 of 11). And the Sale and Purchase Agreement dated August 23, 2018 was between Brinley and Yunhua. *See* 8/23/18 SPA (Dckt. No. 80-35).

There is no evidence in the record that Freestream entered into an agreement with Yunhua or Bonkoungou. So Freestream has no claim. Defendants could not have interfered with contracts between Freestream and the seller or the buyer if no such contracts existed.

In their brief, Plaintiffs don't come forward with any reason why Defendants tortiously interfered with a contract involving Freestream. In fact, Plaintiffs don't even mention Freestream in their brief. Not once. The only exception is the case caption. *See* Pls.' Mem. (Dckt. No. 77).

The Court grants summary judgment to Defendants on Count V, because there is no evidence in the record of a contract between Freestream and Brinley. The Court grants summary judgment to Defendants on Counts I–IV to the extent that those claims involve contracts with Freestream, because there were no contracts involving Freestream. Freestream is out of the picture, and out of the case.[30]

**B.     The Claims Involving Brinley**

That leaves Brinley as the only remaining Plaintiff with a claim of tortious interference with contract. But Brinley hasn't mustered enough evidence to get to a jury, either.

At times, the record and the briefs are a muddy track. Plaintiffs, in particular, scramble the chronology by telling parts of the story out of order. The spinning and swirling of events can create confusion, and paint a misleading picture of what was taking place when. For example, at times, Brinley accuses Defendants of interfering with the Sale and Purchase Agreement in *June*, even though Brinley did not enter into that agreement until *July*.[31]

---

[30] The Court grants summary judgment to Defendants and against Freestream on Counts VI to VIII (*i.e.*, the claims of tortious interference with prospective economic advantage) for the same reasons. The loosey-goosey arrangement between Brinley and Freestream was too indefinite and ill-defined to establish a reasonable expectation of a prospective economic advantage. Overall, the amended complaint reads as if Plaintiffs were stretching much too hard to bring potential claims and throw the book at Defendants.

[31] Taking a step back, Plaintiffs' brief is riddled with inaccuracies and overstatements, large and small. It has an uncomfortable relationship with the record, which is a distant relative, at best. It should have come with a disclaimer: "Based in Part on a True Story."

So, for the sake of clarity, the Court will separate the story into two volumes. The Court will start with the conduct before the Cease and Desist Letter on July 28, 2018, and then will address the conduct after the Cease and Desist Letter.

The Court will separate the characters, too. The Court will address Defendants' dealings with Yunhua (the seller) before the Cease and Desist Letter, and then will address Defendants' dealings with Bonkoungou (the buyer) before the Cease and Desist Letter. And the Court will do the same thing – separating the seller and the buyer – when discussing the facts after the Cease and Desist Letter.

### 1. Before the Cease and Desist Letter

For starters, Brinley has not come forward with evidence to support a tortious interference claim about any conduct by the Defendants before July 28, 2018, meaning the date of the Cease and Desist Letter.

Up to that point, there is no evidence that Defendants knew about a contract between Brinley and anyone else. To be sure, there is evidence that Defendants knew about ongoing *negotiations* about a potential sale of the plane. But knowledge of negotiations is different than knowledge of a contract. And in any event, there is no evidence that Defendants induced a breach.

### a. Defendants' Dealings with Yunhua/ICBC (the Seller)

Brinley has not come forward with evidence that Defendants knowingly and unjustifiably induced a breach by Yunhua before the Cease and Desist Letter on July 28. The scant evidence mustered by Brinley could not support a verdict in its favor by a reasonable jury.

Recall how Dusek entered the story. Dusek heard from Moussa Diarra that a deal was "cratering" on an airplane. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 12 (Dckt.

No. 82); *see also* Dusek Dep., at 113:4-20, 114:17 – 115:14 (Dckt. No. 80-1); Dusek Dep., at 113:10-16 ("[H]e [*i.e.*, Diarra] goes, 'You know, there's an airplane – there's a deal cratering or they rejected an airplane, guys are looking for – some guys – these guys, this group here is looking for a – a large aircraft, and they rejected this.'"); Dusek Dep., at 114:18-21 (agreeing that "Moussa [Diarra] told you that a deal had recently cradled – cratered" for the plane with a group in Africa). According to Diarra, "[i]t was too expensive." *See* Dusek Dep., at 115:13-14.

In its brief, Brinley claims that "Diarra (Bonkoungou's agent) told Defendant Dusek *about Plaintiffs' deal* before Defendants first contacted Yunhua." *See* Pls.' Mem., at 1–2 (Dckt. No. 77) (emphasis added); *see also id.* at 3 ("Defendants contacted Moussa Diarra, an agent of Bonkoungou, who informed Defendants about Plaintiffs' expected transactions."); *id.* at 9 ("Dusek had a conversation with Bonkoungou's agent about Plaintiffs' deal for the A319 *before* Dusek ever contacted Yunhua.") (emphasis in original); *id.* at 11 ("Defendants caused those breaches, including by repeatedly contacting Yunhua after learning about Plaintiffs' transaction from Diarra.").

That's much too strong. Diarra told Dusek that a deal to sell the airplane was *cratering*. *See* Dusek Dep., at 113:4-20, 114:17 – 115:14 (Dckt. No. 80-1). Diarra did not tell Dusek that anyone had a contract to buy the airplane. He said that a deal was falling apart – not that a deal was coming together, let alone that a deal was already done. And he didn't say anything about Brinley, either.

After that call with Diarra, Dusek scoured the internet, and spotted an advertisement on AMSTAT about a plane that was for sale. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 30 (Dckt. No. 79). The listing said that it was "non-exclusive," meaning that the broker did not have exclusive rights. *Id.* at ¶ 32.

Dusek reached out to ICBC (Yunhua's affiliate) on June 25, 2018. *Id.* at ¶ 33. ICBC responded that negotiations were underway with another potential buyer, but there was no deal. *Id.* at ¶ 34. "Currently we are negotiating with another client but the purchase agreement has not been signed yet." *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 19 (Dckt. No. 82); *see also* 6/25/18 Email (Dckt. No. 80-18, at 2 of 4). Notice the words: there were "negotiat[ions]," but there was no "purchase agreement." *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 19. A contract "has not been signed yet." *Id.*

The next day, ICBC emailed Dusek that it expected to reach a deal soon with the other potential buyer. *See* 6/26/18 Email (Dckt. No. 80-18, at 2 of 4). But in the meantime, ICBC solicited an offer from Dusek: "The current ongoing transaction is expected to have a result within two weeks. I will let you know if the aircraft is formally released for sale again. As for the price, if you are interested in the aircraft*, please make offer*." *Id.* (emphasis added).

As requested, Dusek circulated a proposed term sheet on June 27, 2018. *See* 6/27/18 Email (Dckt. No. 80-18, at 1 of 4). ICBC responded: "Thanks for your quick reply. We will review your term sheet." *Id.* But once again, ICBC pointed to ongoing "negotiation[s]" with another interested buyer, not a contract. "Sorry that we cannot give you feedback and discuss with you in depth now as we are in negotiation with another client. I will come back to you once the aircraft is available for sale again." *Id.* Again, the key word is "negotiation." *Id.*

That's it. There is no evidence that Dusek and RSH (his company) knew about any contract between Brinley and Yunhua before receiving the Cease and Desist Letter on July 28, 2018. There is evidence that Defendants knew about a *potential* deal (between Yunhua and someone else), but there is no evidence that they knew about an *actual* deal. Without knowledge of a contract, there is no claim. *See, e.g.*, *Webb*, 906 F.3d at 577; *Wheel Masters, Inc. v. Jiffy*

*Metal Prods.*, 955 F.2d 1126, 1130 (7th Cir. 1992); *Empire Indus., Inc. v. Winslyn Indus., LLC*, 327 F. Supp. 3d 1101, 1112 (N.D. Ill. 2018); *see also* Restatement (Second) of Torts § 766 cmt. i (Am. Law Inst. 1979) ("To be subject to liability under the rule stated in this Section, the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract.  Although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract.").

And notice what else didn't happen.  There is no evidence that Dusek encouraged Yunhua to break a contract with the other buyer.

A tortious interference claim requires evidence of inducement.  "Intent to induce 'requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way.'"  *Webb*, 906 F.3d at 579 (quoting *In re Estate of Albergo*, 275 Ill. App. 3d 439, 211 Ill. Dec. 905, 656 N.E.2d 97, 103 (1995)); Restatement (Second) of Torts § 766 cmt. h (Am. Law. Inst. 1979) ("The essential thing is the intent to cause the result.  If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.").  Inducement "requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another."  *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 802 (N.D. Ill. 2011) (quoting *R.E. Davis Chem. Corp. v. Diatonic, Inc.*, 826 F.2d 678, 687 (7th Cir. 1987), *modified on other grounds*, 924 F.2d 709 (7th Cir. 1991)).  It is not enough that the defendants "merely created a condition that opened the way" for the breach.  *See Cohen v. Lewis*, 2004 WL 2481015, at *7 (N.D. Ill. 2004).

Dusek didn't even encourage Yunhua to cut off negotiations with the other interested party. Instead, ICBC (Yunhua's affiliate) asked Dusek to submit a term sheet, so that Yunhua could keep it in its back pocket while negotiations continued with the other buyer. And Dusek responded to that solicitation by submitting a term sheet. Dusek never encouraged Yunhua to give the other potential buyer the shaft.

Brinley throws a lot at the wall, trying to show that Dusek knew about a contract between Brinley and Yunhua. Nothing sticks.

Brinley relies on a phone call that Dusek had with someone in the industry named Lee Krelstein in July 2018.[32] Dusek testified that Krelstein told him that "Alireza [*i.e.*, Alireza Ittihadieh, the principal of Brinley] was doing that airplane and jet." *See* Pls.' Statement of Additional Facts, at ¶ 31 (Dckt. No. 78); *see also* Dusek Dep., at 302:6 – 305:17 (Dckt. No. 80-1). Dusek testified: "I never met Lee. I like Lee, but I never met Lee. 'Well, what do you got going? You know, Alireza was doing that airplane and jet' – and this crap. I heard all this chatter and all this crazy talk." *See* Dusek Dep., at 305:8-13.

That testimony is too cryptic and unintelligible to support a claim. What does "doing that airplane" mean? Thinking about it? Inspecting it? Negotiating for it? Buying it? Something else? Based on that thin testimony, no reasonable jury could find that Dusek knew that Brinley had entered into a contract to buy the plane. *See Feldman*, 850 F.2d at 1224.

Next, Brinley argues that Dusek "knew enough about Plaintiffs' transactions to undercut the end purchase price on the A319 while they were convincing Yunhua that they could offer a safer alternative." *See* Pls.' Mem., at 9 (Dckt. No. 77). That doesn't follow at all. The fact that

---

[32] Dusek described Lee Krelstein as a guy in Florida who works in the industry. *See* Dusek Dep., at 133:3-8 (Dckt. No. 80-1) ("Lee Krelstein, I never met Lee Krelstein, but I've talked to Lee and his group there in – in Florida. There's some cool guys working there. They buy and sell aircraft, and they're managers of transactions . . . .").

Dusek offered $X for the plane does not mean that Dusek knew about a contract between Brinley and Yunhua. And in any event, recall what Diarra told Dusek about the deal that was "cratering": a price in the "high 50s, 50 millions" was "too expensive," but a price "close to 50 million . . . might fly." *See* Dusek Dep., at 120:9-14, 122:5-23, 124:5-13 (Dckt. No. 80-1). So he knew a price range, without hearing anything about a contract.

Another example of stretching too far is Brinley's argument that Dusek made false statements about the type of deal that he could do (*e.g.*, with a Bahamian client, and so on). *See* Pls.' Mem., at 9 (Dckt. No. 77). Brinley argues that Dusek made false statements to Yunhua, and therefore Dusek had "knowledge of Plaintiffs' A319 transaction." *Id.* Again, that doesn't follow at all.

Similarly, there is no evidence that Dusek induced Yunhua to breach a contract before receiving the Cease and Desist Letter on July 28, 2018 (or at any other time, for that matter). A tortious interference claim requires the inducement of a breach of contract. *See Webb*, 906 F.3d at 577.

Brinley argues that Yunhua breached the Sale and Purchase Agreement by negotiating with Dusek about selling the airplane. *See* Pls.' Mem., at 11 (Dckt. No. 77). Brinley points to language in the Sale and Purchase Agreement (dated July 4) that required Yunhua to take the plane off the market. *See* 7/4/18 SPA, at § 2.4 (Dckt. No. 80-12) ("Upon execution of this Agreement, the Aircraft shall be removed from the market and Seller shall not enter into any agreement or discussions to sell or lease the Aircraft to any person other than Purchaser . . . .").

But when alleging a breach, Brinley walks backwards in time. Brinley argues that Yunhua breached that agreement by negotiating to sell the airplane to Dusek. Brinley relies heavily on emails that Dusek exchanged with ICBC from June 25–27, claiming that they are

evidence of interference. *See, e.g.*, Pls.' Mem., at 9 (Dckt. No. 77) ("As early as June 25, 2018, Yunhua informed Defendants multiple times of Plaintiffs' agreements and expectancies with Yunhua and that they precluded Yunhua from negotiating with Defendants."); *see also* Pls.' Statement of Additional Facts, at ¶¶ 19–22 (Dckt. No. 78); Pls.' Resp. to Defs.' Statement of Facts, at ¶ 37 (Dckt. No. 79) ("Notwithstanding Defendants' knowledge of Plaintiffs' transaction, which precluded ICBC from being able to negotiate with them, they contacted ICBC multiple times and sent written offers to purchase the A319."); Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 35–38.

Brinley is telling the story out of chronological order. The communications in question between Dusek and ICBC took place from June 25–27. And Yunhua signed the Sale and Purchase Agreement with Brinley on July 4. Yunhua couldn't have breached the Sale and Purchase Agreement in June, because the contract did not exist until July. Communications in June can't breach an agreement in July.

All too often, Brinley snips different pages from the storybook, puts them in a new order, and then tells a new tale. Consider, for example, the following passage from Brinley's brief:

> [A]ll of Yunhua's discussions with Defendants concerning the A319 constituted breaches of the July 4, 2018 SPA between Yunhua and Brinley, which required Yunhua to 'remove [the A319] from the market' and 'not enter into any agreement or discussions to sell or lease the [A319] to any person other than [Plaintiffs].' SAF ¶ 5. Defendants caused those breaches, including by repeatedly contacting Yunhua after learning about Plaintiffs' transaction from Diarra. *Id.* ¶¶ 12-22.

*See* Pls.' Mem., at 11 (Dckt. No. 77) (bracketed material in original).

That's completely backwards. The Sale and Purchase Agreement was signed on July 4, but the conversations described in the second sentence took place in June. Brinley's own Rule 56.1 statement makes *that* clear. *See* Pls.' Statement of Additional Facts, at ¶¶ 12–16 (Dckt. No.

78) (describing a conversation with Diarra before June 25); *id.* at ¶¶ 16–22 (describing

communications between Dusek and ICBC in June).  Dusek couldn't do anything in *June* to

induce a breach of contract when the contract did not exist until *July*.

Defendants did not do anything after July 4 (the date of the Sale and Purchase

Agreement) to induce Yunhua to breach that agreement, either.  Also, there is no evidence that

Defendants knew about the existence of the Sale and Purchase Agreement dated July 4 before

receiving the Cease and Desist Letter on July 28.[33]

Brinley points to the fact that Dusek's negotiations with Yunhua continued in July.  The

parties agree that Dusek negotiated to buy the plane from ICBC in July.  *See* Pls.' Resp. to Defs.'

Statement of Facts, at ¶ 37 (Dckt. No. 79) ("In July, 2018 Dusek and ICBC negotiated for the

potential sale of the Aircraft . . . .").  In its Statement of Additional Facts, Brinley cites a few

emails from July, when Dusek expressed interest to ICBC in buying several airplanes.  *See* Pls.'

Statement of Additional Facts, at ¶¶ 21, 22 (Dckt. No. 78).  One of the planes was a Gulfstream

G550 (*i.e.*, a different plane), and the other was the plane in question (an A319).

Dusek expressed an interest in both planes, and ultimately made an offer in mid-July.

*See* 7/6/18 Email (Dckt. No. 80-19, at 7 of 8) (email from Dusek to ICBC) ("Regarding the

A319ACJ, we will wait another week as per your request."); 7/10/18 Email (Dckt. No. 80-19, at

6 of 8) (email from Dusek to ICBC) ("I am available to discuss this opportunity [*i.e.*, for the

G550, not the plane at issue] as well as the A319ACJ [*i.e.*, the plane at issue] this evening if need

be."); 7/13/18 Email (Dckt. No. 80-19, at 2 of 8) (email from Dusek to ICBC) ("We would like

to proceed with negotiations for both your A319ACJ and Gulfstream G550. . . .  I am pleased to

---

[33] In fact, in the email dated July 31, 2018, ICBC's counsel told Dusek that no Sale and Purchase
Agreement ever existed:  "[A]ccording to the LOI [*i.e.*, the Letter of Intent dated May 9], the parties were
expected to enter into a formal SPA within 15 business days, *the parties were never able to agree on the
SPA.*"  *See* 7/31/18 Email (Dckt. No. 49-2, at 16 of 29) (emphasis added).

offer your group $65,000,000.00 U.S. Dollars combined for both the A319ACJ and G550."); 7/15/18 Email (Dckt. No. 80-20, at 1 of 3) (email from Dusek to ICBC) ("I have attached a signed LOI for $45,000,000.00 U.S. for the A310ACJ[34] . . . ."). That offer went nowhere. ICBC responded: "46M is below our expectation. Let us discuss and revert soon." *See* 7/15/18 Email (Dckt. No. 80-20, at 1 of 3) (email from ICBC to Dusek).

Those emails cannot move the needle. There is no evidence that Yunhua ever told Dusek that it had entered into the Sale and Purchase Agreement on July 4. That is, there is no evidence that anyone told Dusek that Yunhua had entered into a contract on July 4 that locked up the airplane and prevented Yunhua from discussing a potential sale to anyone else.

That lack of knowledge precludes a claim. A tortious interference claim requires knowledge of the existence of a contract, and an intentional inducement of a breach. *See Webb*, 906 F.3d at 577. Here, the evidence falls far short. No one told Dusek about the contract from July 4, so he was free to try to buy the plane.

Brinley has an insurmountable causation problem, too. Anything that Defendants hypothetically said or did in July 2018 did not keep Brinley from buying the plane. In fact, Brinley and Yunhua entered into their second Sale and Purchase Agreement on August 23, 2018. *See* 8/23/18 SPA (Dckt. No. 80-35). In August 2018, Brinley was willing to buy the plane, and Yunhua was willing to sell the plane – at an agreed upon price – despite Dusek's attempt to buy the plane weeks earlier.

And even then, there's nothing in the record supporting the notion that Defendants induced Yunhua to put the plane back *on* the market when it was supposed to be *off* the market. The facts do not support the theory that Defendants (1) knew that Yunhua had a contractual

---

[34] The Court assumes that this word was a typo, and that "A310ACJ" should have been "A319ACJ." The email chain discusses an A319ACJ, which was the model of the plane in question.

obligation to withdraw the plane from the market; but (2) convinced Yunhua to make the plane available for sale. There is no evidence to support the notion that Defendants coaxed Yunhua to break a deal with Brinley and put the plane back on the market.[35]

Brinley also argues that Defendants made misrepresentations to Yunhua when attempting to buy the plane. For example, Dusek sent an email on June 25, 2018, saying that he had an "acquisition agreement" with a "Bahamian client." *See* Pls.' Mem., at 3 (Dckt. No. 77); *see also* 6/25/18 Email (Dckt. No. 80-18, at 3 of 4).

Those statements made no difference. There is no evidence in the record that Yunhua breached any agreement with Brinley based on any statements by Dusek. In fact, Yunhua and Brinley entered into the second Sale and Purchase Agreement on August 23, long after the statements in question.

### b.    Defendants' Dealings with Bonkoungou (the Buyer)

On the flipside, Plaintiff's claims are equally weak on the other side of the ledger, meaning the dealings with the prospective buyer. There is no evidence that Dusek and RSH knew about any contract between Brinley and Bonkoungou, the potential buyer. It is true that Brinley and Bonkoungou signed the Offer Letter on May 9–10, 2018. *See* 5/9/18 Offer Letter

---

[35] ICBC's counsel emailed Dusek about the Cease and Desist Letter on July 31, 2018. *See* 7/31/18 Email (Dckt. No. 49-2, at 16 of 29). ICBC's counsel revealed that Yunhua decided to put the plane back on the market on July 19 because the proposed transaction with Brinley was not going as planned. "On 19 July, ICBCFL wrote to Brinley's broker to the effect that, given that the transaction was not proceeding as contemplated, ICBCFL would resume marketing the aircraft." *Id.* That statement is fair game if it is offered to prove Dusek's *knowledge* and *intent*. That is, Dusek heard on July 31 that the seller saw no problems with offering the plane for sale. But the statement would be hearsay if offered to prove that ICBC really did tell Brinley's broker on July 19 that it was putting the plane back on the market because Brinley and Yunhua weren't making progress. Maybe something significant happened on July 19 that affected the state of play, but if so, the parties don't offer much evidence about it. The July 19 emails are in the appendix of exhibits, without much explanation from the parties. *See* 7/19/18 Emails (Dckt. No. 80-17). Overall, the key thing is that Dusek knew on July 31 that ICBC put the plane back on the market on July 19.

41

(Dckt. No. 80-5). But there is no evidence that Defendants knew about it. And there is no evidence of a breach, or that Defendants induced a breach.

The record does include some scattered speculations and suspicions that someone might have done something. By July 1, Brinley and Bonkoungou had promising negotiations. *See* 7/1/18 Email (Dckt. No. 80-14); 7/1/18 Email (Dckt. No. 80-15, at 2 of 2). But Bonkoungou then backed out. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 11 (Dckt. No. 82).

Brinley suspected mischief. Brinley's theory is that "someone interfered with the deal by offering the same plane for less money." *See* Pls.' Statement of Additional Facts, at ¶ 11 (Dckt. No. 78).

There was no evidence to back up the suspicion of foul play. Brinley relies on testimony from Alireza Ittihadieh, who heard it from Mike Savary, who heard it from Bonkoungou. He heard that "somebody" was doing "something," meaning "some sort of interference." *See* Ittihadieh Dep., at 74:3-7 (Dckt. No. 80-3) ("Because we didn't have a deal until July, because we had – *we had some sort of interference. We didn't know where it came from*. And Mr. Bonkoungou Mahamadou told Mike Savary that he's been offered the same airplane for less money.") (emphasis added); *id.* at 82:9-12 ("[A]nd then Mike, again, called me. He said, 'Look, *it seems like there is something going on*, and we are – we're being – *somebody is interfering* with our deal.'") (emphasis added); *id.* at 82:16, 19-23 ("So then Mike went to Paris [to] see him . . . . And Mike called me, and he said, 'He's telling us – telling me that he has been offered the same airplane by another broker for substantially less.' And he mentioned the number 50."). Brinley came forward with nothing but speculation and hearsay.

Brinley points to a phone call that Ittihadieh (the principal of Brinley) had with Dusek in July 2018. According to them, "Plaintiffs' principal, Alireza Ittihadieh, called Dusek and directly told him about the Plaintiffs' deal." *See* Pls.' Mem., at 2 (Dckt. No. 77); *see also* Pls.' Statement of Additional Facts, at ¶ 30 (Dckt. No. 78) ("In July of 2018, Defendants were advised *again* – this time by Brinley – of the specific fact that there was an ongoing transaction that contemplated Brinley purchasing the A319 from ICBC and reselling it first, through a direct phone call from Plaintiffs' principal.") (emphasis in original) (citing page 322 of the Dusek deposition transcript); *see also* Dusek Dep., at 322:6-12 (Dckt. No. 80-1).

That's not a fair depiction of what Dusek actually said at deposition. The conversation was about ongoing *negotiations*, not a done deal. More specifically, the conversation was about Bonkoungou's negotiating tactics. They talked about the buyer's attempt to play Brinley and RSH off of each other, as competing sellers.

According to Dusek, Ittihadieh told him that the "Burkina Faso folks" were "playing us up against each other." *See* Dusek Dep., at 60:5-17 (Dckt. No. 80-1); *see also id.* at 62:16-19 ("And he said, 'It sounds like they're playing us against each other. They're playing us against each other.'"); *id.* at 57:21 – 66:26. And *Ittihadieh* even offered *Dusek* $600,000 to "get out of this deal," meaning end negotiations on behalf of RSH, and thus allow Brinley to negotiate with Bonkoungou without a competitor. *Id.* at 63:19-22. That testimony is a far cry from the notion that Brinley told RSH that Brinley already had a done deal.

There is no evidence that Bonkoungou breached a contract with Brinley, either. At that point, the only contract between Brinley and Bonkoungou was the Offer Letter dated May 10, 2018. *See* 5/9/18 Offer Letter (Dckt. No. 80-5). But the Offer Letter did not bind Bonkoungou to buy anything. The Offer Letter was "subject to the negotiation and entering into of a

definitive Aircraft Sale and Purchase Agreement in respect of the sale of the Aircraft by the

Seller and its purchase by the Buyer . . . ."  And it set a deadline of June 5, 2018.  *Id.*; *see also id.*

at 2.

The record shows that Brinley and Bonkoungou negotiated, and came close to signing a

Sale and Purchase Agreement.  But they never got there.  The failure to enter into a sale

agreement was not a breach.  That's how deal-making goes sometimes.  There is no evidence of

a breach, and without a breach, there's no claim.  *See Webb*, 906 F.3d at 577.

At times, Brinley suggests that it entered into a Sale and Purchase Agreement with

Bonkoungou.  Brinley argues that it "came to an agreement on all material terms with

Bonkoungou."  *See* Pls.' Mem., at 1 (Dckt. No. 77); *id.* at 3 ("Likewise, after Plaintiffs and

Bonkoungou executed their LOI the parties negotiated the terms of a SPA through counsel and

agreed on all material terms."); Pls.' Statement of Additional Facts, at ¶ 10 (Dckt. No. 78)

("Pursuant to this agreement, Bonkoungou agreed to purchase the A319 from Brinley for $57

million.").

But once again, the evidence does not live up to its billing.  Brinley cites two pieces of

evidence to support the notion that it entered into a sale agreement with Bonkoungou.  *See* Pls.'

Statement of Additional Facts, at ¶ 10 (Dckt. No. 78).  The first piece of evidence is an unsigned,

redline version of the Sale and Purchase Agreement.  *Id.*; *see also* Draft SPA (Dckt. No.

80-16).[36]  A draft agreement isn't a contract.  It's just a piece of paper.

---

[36]  Notice the artful phraseology on page one of Plaintiffs' brief:  Brinley "executed an SPA with Yunhua and *came to an agreement on all material terms with Bonkoungou*."  *See* Pls.' Mem., at 1 (Dckt. No. 77) (emphasis added).  Brinley is trying to give the impression that it entered into a contract to sell the plane to Bonkoungou.  That misimpression is misleading.  The simple reality is that they never signed one. Bonkoungou rejected the plane after a visual inspection, and the parties never came to an agreement on a material term:  price.

44

The second piece of evidence is the testimony of Fred Meyer.  *See* Pls.' Statement of Additional Facts, at ¶ 10 (Dckt. No. 78).  He was the attorney for Global Jet Monaco, who was "advising the final buyer."  *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶¶ 8, 9 (Dckt. No. 82).  But Meyer didn't testify that Brinley and Bonkoungou had reached a deal.

If anything, he did the opposite.  He testified that the *attorneys* had come to terms on the important points.[37]  *See* Meyer Dep., at 39:24 – 42:10 (Dckt. No. 80-2) (detailing the negotiations with John Tesei, attorney for Brinley, who eventually "communicate[d] his agreement" to the draft SPA); *see also id.* at 18:10-25 (establishing Tesei as the attorney "representing Brinley").

Meyer squarely testified that the approval of the attorneys wasn't good enough (as any lawyer should know).  Meyer acknowledged that any deal was subject to the approval of the clients themselves:

> Q:    Now, as of July 1, 2018, when you sent this revised draft to Mr. Tesei was it your understanding that all of the terms of the aircraft purchase agreement had been agreed upon?

> \* \* \*

> A:    At that point in time you must understand that we were under time pressure because in order to organize the visual inspection the next week, the flight cost had to be paid the day after, on the Monday morning.  So, given this time pressure, this agreement that was attached to my e-mail reflected what we could achieve given those particular circumstances.  But, *of course, I was not the final decision-maker.  The final decision-maker was Mr. Bonkoungou himself*, at this point, so that's why I always reserved his position and I always mentioned that *I needed his green light* before proceeding with the signature, *obviously*.  So, to my understanding, this draft was the best we could achieve in the circumstances.

> Q:    Well, can you recall any open issues as of July 1, 2018 regarding the aircraft purchase agreement itself?

---

[37]  Plaintiffs quietly concede the point.  They contend that the *lawyers* had no issues, which doesn't get them very far.  *See* Pls.' Statement of Additional Facts, at ¶ 9 (Dckt. No. 78) ("At that point [*i.e.*, July 1, 2018], there were no open issues *between the attorneys* negotiating the transaction.") (emphasis added).

A:    Not between John and me.  I think we had solved everything we could solve at this stage, but ***the final decision remained, obviously, with the principal of the buyer***.

Q:    And, Mr. Meyer, do you recall whether this aircraft purchase transaction by Alti went ahead at this time?  Was [it] completed?

A:    No, it was not.

*Id.* at 42:24 – 44:8 (emphasis added).

In its brief, Brinley attempts to downplay the lack of final approval by Bonkoungou, the buyer.  "[O]n July 1, 2018, Bonkoungou's counsel indicated that Bonkoungou and Brinley had agreed to all material terms, thus forming a contract. . . .  All that remained to complete the transaction was getting Bonkoungou's 'green light' (*i.e.*, approval) after the visual inspection that the Bonkoungou-Brinley SPA contemplated."  *See* Pls.' Mem., at 6 (Dckt. No. 77).

But there *was no* "Bonkoungou-Brinley SPA."  It was just a draft, prepared by attorneys, awaiting client approval.  Without client approval, there was no deal.  Brinley basically is arguing that it had a contract with the buyer – all it needed was the *consent of the buyer*.  But the consent of the parties is the whole ballgame.

The need for a "'green light' (*i.e.*, approval)" isn't a small thing.  *Id.*  It's the only thing. Without approval from the parties to a proposed contract, there is no contract.  Here, the buyer did not yet give his "approval" for the purchase.  So there was no agreement.

An argument that the buyer still needed to give the "green light" is a concession that the light was still red.  The buyer had not given the green light, so the deal was not yet a "go."

The notion that Brinley and Bonkoungou came to an agreement on "all material terms" is completely wrong.  *See* Pls.' Mem., at 1 (Dckt. No. 77).  The record shows that they did not

come to an agreement on the most basic part of the deal: price. After seeing the plane for himself, Bonkoungou demanded a lower price, and the parties never closed the gap.

It is difficult to understand how Brinley could represent to the Court that Bonkoungou "breached the August 3, 2018 SPA between Bonkoungou and Brinley." *Id.* at 12. There *was no* Sale and Purchase Agreement between Bonkoungou and Brinley. As support, Brinley cited an unsigned, draft version of that agreement. *Id.* (citing Pls.' Statement of Additional Facts, at ¶ 38 (Dckt. No. 78)); *see also* 8/3/18 Draft Sale and Purchase Agreement (Dckt. No. 80-37) (lacking signatures, and saying "DRAFT" at the top of page one). The most important part of that document was the blank signature lines.

Summary judgment is the "put up or shut up" time in a lawsuit. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (cleaned up). But in the end, Brinley came to the courthouse empty handed. It's evidentiary cupboard was bare.

In sum, there is no evidence in the record that Defendants knew about a contract between Brinley and Yunhua, or between Brinley and Bonkoungou, before receiving the Cease and Desist Letter. There is no evidence that Defendants intentionally and unjustifiably induced Yunhua or Bonkoungou to breach a contract with Brinley. So the Court grants summary judgment to Defendants on Counts I–IV to the extent that those claims involve any conduct by Defendants before receiving the Cease and Desist Letter on July 28, 2018.

### 2. After the Cease and Desist Letter

The final piece is the conduct by Defendants after receiving the Cease and Desist Letter. But once again, Brinley comes up short.

### a.     Defendants' Dealings with Yunhua/ICBC (the Seller)

As a refresher, on July 28, 2018, Brinley's counsel sent the Cease and Desist Letter, claiming that Brinley had the contractual right to buy and sell the airplane.  "Brinley has the benefit of the exclusive right to purchase the Aircraft from Yunhua under the terms of a sale and purchase agreement.  Brinley also has a signed offer and acceptance letter from an onward purchaser."  *See* Cease and Desist Letter (Dckt. No. 49-2, at 12 of 29).  Brinley's counsel accused RSH of "seeking to interfere with Brinley's business relationships with these counterparties in order to divert business from Brinley to RSH."  *Id.*

Counsel for RSH forwarded the letter to ICBC, and asked for an explanation.  *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 79); 7/29/18 Email (Dckt. No. 49-2, at 11 of 29) ("I presume the sender is mistaken.").

ICBC responded right away, saying that the allegations of the letter were "untrue."  *See* 7/28/18 Email (Dckt. No. 49-2, at 11 of 29).  ICBC made clear that its negotiations with Dusek were "valid and confidential."  *Id.*

ICBC's lawyers cemented the point, twice.  That very day, ICBC's counsel responded that the accusations in the Cease and Desist Letter were "expressly rejected and denied."  *See* 7/28/18 Email (Dckt. No. 49-2, at 14 of 29).  Counsel even encouraged Dusek and RSH to keep negotiating:  "Please continue with the transaction."  *Id.*

Three days later, ICBC's counsel rejected the Cease and Desist Letter a second time.  *See* 7/31/18 Email (Dckt. No. 49-2, at 16 of 29).  After summarizing the contractual lay of the land, counsel confirmed that Brinley had no rights to the plane at all.  "[A]t the time BSF wrote to RSH Air, ICBCFL had not entered into any binding agreement to sell the aircraft to Brinley, *nor is Brinley entitled to any exclusive rights to purchase the aircraft legally*, and at the time BSF

48

wrote to RSH Air, Brinley was made aware that ICBCFL has already resumed marketing the aircraft." *Id.* (emphasis added). And again: "[W]e would like to reiterate our position that any and all suggestions and accusations in BSF's email dated 28 July are expressly rejected and denied." *Id.*

So, at the end of July, Dusek heard different things from different people. The competing buyer (Brinley) claimed that it had exclusive rights to buy the airplane. But the seller (Yunhua) said that Brinley was way off base, and that Brinley had no contractual rights to the plane at all. The competing buyer said that there *was* a contract, and the seller said that there *wasn't*.

That scenario raises the question whether a party can bring a tortious interference claim when there was a dispute at the time about whether a contract existed at all. That is, the question is whether Buyer #1 can bring a tortious interference claim against Buyer #2 when Seller says that there is no contract. Can Buyer #2 tortiously interfere with a contract between Buyer #1 and Seller, if Buyer #1 and Seller disagree about whether they have a contract? If the Seller tells Buyer #2 that there is no contract, can Buyer #1 bring a tortious interference claim against Buyer #2?

The parties cite a few cases that are in the ballpark, but not on point. The first case, *D 56, Inc. v. Berry's Inc.*, 955 F. Supp. 908 (N.D. Ill. 1997), involved a letter from a manufacturer who claimed that it had agreements with dealers barring re-selling. *Id.* at 917. The letter did not provide the agreements themselves, so the issue was whether a mere assertion about the existence of a contract was good enough (or whether the letter needed to provide a copy). *Id.* The case did not involve a dispute between the manufacturer and the dealers about whether the agreements existed. *Id.* The other case, *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765 (N.D.

49

Ill. 2011), was about whether knowledge of a contract is enough to prove knowledge of an exclusivity provision in a contract. *Id.* at 798–800.

The Court is left without much guidance about how Illinois courts would resolve the issue. So the Court goes back to first principles. A tortious interference claim requires knowledge or constructive knowledge of the existence of a contract. *See Webb*, 906 F.3d at 577. It is hard to see how a defendant could know that there is a contract if one of the supposed parties to the contract says that there *is no* contract. A tortious interference claim also requires an intentional and unjustifiable inducement of a breach. *Id.* But it is hard to see how Buyer #2 could intentionally and unjustifiably induce a breach of contract by Seller if Seller is the one saying that there *is no* contract.

Even if, for the sake of argument, a claim against Buyer #2 could exist in that situation, Brinley has no claim here for other reasons. There is no evidence in the record that Defendants did anything after receiving the Cease and Desist Letter to induce a breach.

Start, once again, with Dusek's dealings with Yunhua/ICBC. Dusek terminated its negotiations with ICBC on August 6, 2018. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 46–47 (Dckt. No. 79). So the question is whether Dusek did anything between receiving the Cease and Desist Letter on July 28 and terminating negotiations on August 6.

The evidentiary record cannot support a claim. There isn't much in the record about what, if anything, Dusek did during that week. The parties agree that Dusek "continued to negotiate" with ICBC until August 6. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 33 (Dckt. No. 82). But that's about it.

To bring a claim, Brinley would need to come forward with evidence that Dusek intentionally induced a breach of contract by Yunhua, and that the breach caused Brinley to suffer damages. There is no such evidence in the record.

Brinley relies heavily on an email that Yunhua sent to Dusek on August 4. *See* Pls.' Mem., at 2 (Dckt. No. 77). The email was about whether a sale from Yunhua to RSH was contingent on a sale from RSH to an end buyer. Yunhua wrote:

> If what you are suggesting is that your client's ability in doing so is contingent upon your client being able to secure its deal with its sub-buyer, then it would be a very different deal than what we thought we have agreed on. You would appreciate that our client has terminated its discussion with the former opportunity and given your client a big discount under the impression that our client would have a smoother, firmer and quicker deal with your client.

*See* 8/5/18 Email (Dckt. No. 80-21, at 2 of 3).[38, 39] Dusek wrote right back, explaining that there was no such contingency. *Id.*

Brinley seems to view that email as a bombshell, arguing that it was "critical evidence." *See* Pls.' Mem., at 2 (Dckt. No. 77). Hardly. A statement by Dusek that he could offer a

---

[38] The email is hearsay because it is an out-of-court statement that is offered for its truth. That is, Brinley offers the email to prove that Yunhua really did pull out of discussions with Brinley because of something said by Dusek. Rule 56 requires admissible evidence, and hearsay is not admissible unless an exception applies (and Brinley makes no argument for a hearsay exception) (so any such argument is waived). *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("And hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial . . . .") (carving out an exception for depositions and affidavits); *Wheatley v. Factory Card and Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) ("The evidence need not be admissible in form, but must be admissible in content . . . ."); *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996). The parties apparently did not depose Simon Wong, the author of the email. The record does not include a deposition transcript or a declaration from Wong (presumably because he is in Hong Kong).

[39] In its Statement of Additional Facts, Plaintiffs claim that this email dated August 4 appears in the record as Exhibit AA to the Ellis Declaration, meaning Dckt. No. 80-27. *See* Pls.' Statement of Additional Facts, at ¶ 29 (Dckt. No. 78). That's incorrect. Exhibit AA to the Ellis declaration is an email from July 2, 2018. The bates numbers may have caused confusion on the part of counsel. Paragraph 29 cited a document with a bates number of RSH 714, and Exhibit AA (*i.e.*, the wrong document) has a bates number of BRINLEY 714. Defendants cited the correct document in their response. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 29 (Dckt. No. 82); 8/5/18 Email (Dckt. No. 80-21, at 2 of 3).

smoother, firmer, and quicker deal could give rise to a claim only if Dusek knew – at the time of the statement – that a contract existed between Brinley and Yunhua. But here, there is no evidence that Dusek made that statement *after* receiving the Cease and Desist Letter. So, there is no evidence that Dusek made that statement after he had potential knowledge of a contract between Brinley and Yunhua.

There are causation problems, too. Within two days of that email (dated August 4), Dusek backed out of the potential deal for good, never to return. And a few weeks later, Brinley and Yunhua entered into a second Sale and Purchase Agreement. *See* 8/23/18 SPA (Dckt. No. 80-35). So Dusek did not induce a breach that caused an injury.

### b. Defendants' Dealings with Bonkoungou (the Buyer)

Brinley's evidentiary cupboard is similarly bare when it comes to Dusek and Bonkoungou. There is no evidence that Dusek did anything after receiving the Cease and Desist Letter on July 28, 2018 to induce a breach by Bonkoungou.

The parties agree that Dusek continued to negotiate with Bonkoungou after receiving the Cease and Desist Letter. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 33 (Dckt. No. 82). But the details are thin. Brinley, meanwhile, signed a new Offer Letter with Bonkoungou on August 3. *See* 8/3/18 Offer Letter (Dckt. No. 80-36, at 4 of 11). Whatever Dusek did after receiving the Cease and Desist Letter on July 28, it did not keep Brinley and Bonkoungou from signing the Offer Letter on August 3. So it is hard to see how Brinley suffered an injury during that week.

And there is an even bigger problem. There was no breach during that week (from July 28 to August 3) because there was no contract. The only contract that Brinley and Bonkoungou had entered into before August 3 was the Offer Letter dated May 10, and that agreement had a

Documentation Deadline of June 5, 2018. *See* 5/9/18 Offer Letter (Dckt. No. 80-5).[40] So there

was nothing to breach.

Dusek's attempt to sell the plane after August 3 was short lived, too. On August 4,

Dusek offered to sell the plane to Bonkoungou for $46 million. *See* Defs.' Resp. to Pls.'

Statement of Additional Facts, at ¶ 39 (Dckt. No. 82); 8/4/18 Email (Dckt. No. 80-38).

But nothing came of it. Dusek walked away for good on August 6. *See* Pls.' Resp. to Defs.'

Statement of Facts, at ¶ 46 (Dckt. No. 79).

There is no evidence that Dusek induced a breach by Bonkoungou between August 3 and

August 6 (or after, for that matter), when Dusek left the picture. And there is no evidence that

Dusek had knowledge of the existence of the Offer Letter dated August 3, either.

Brinley argues that the "August 3, 2018 SPA between Bonkoungou and Brinley . . .

required Bonkoungou to purchase the A319 from Plaintiffs for $48 million." *See* Pls.' Mem., at

12 (Dckt. No. 77). Brinley contends that "Bonkoungou breached that obligation by refusing to

purchase the Aircraft and demanding instead a far lower purchase price." *Id.*

That's quadruply wrong. First, there was no Sale and Purchase Agreement between

Bonkoungou and Brinley. They signed an Offer Letter, not a Sale and Purchase Agreement.

Second, the Offer Letter made clear that there was no deal without a Sale and Purchase

Agreement. *See* 8/3/18 Offer Letter, at 1 (Dckt. No. 80-36, at 4 of 11) ("This Offer . . . is subject

to the negotiation and entering into of a definitive Aircraft Sale and Purchase Agreement in

respect of the sale of the Aircraft by the Seller and its purchase by the Buyer including the terms

and conditions in Annex 1 to this letter and otherwise in form and substance satisfactory to the

---

[40] Brinley's brief does not appear to argue that Dusek induced a breach of the Offer Letter dated May 10
between Brinley and Bonkoungou. *See* Pls.' Mem., at 12 (Dckt. No. 77). So any such argument is
waived.

Seller and the Buyer . . . ."). Third, the Offer Letter expired on August 10. *Id.* at 2 (Dckt. No. 80-36, at 5 of 11) ("In case the Sale Agreement is not entered into by the Documentation Deadline for any reason whatsoever (including the Buyer's decision not to proceed with the transaction following the Visual Inspection) . . . the parties shall be released from any obligation or liability under this letter."). Fourth, the Offer Letter was contingent on a visual inspection. *Id.*

The plane flunked inspection. Bonkoungou inspected the plane on August 30, and found it lacking. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 26–27 (Dckt. No. 79).

Brinley argues that Bonkoungou breached the implied covenant of good faith and fair dealing by inspecting the plane and demanding a lower price. *See* Pls.' Mem., at 12 (Dckt. No. 77) ("[Bonkoungou] breached the implied covenant in good faith and fair dealing by using the visual inspection condition as a pretext and in bad faith as leverage to demand a lower purchase price from Plaintiffs and to ultimately disengage from the transaction."). That is, Brinley's theory appears to be that Dusek interfered with the contract by offering a lower price for the airplane. According to Brinley, that lower price caused Bonkoungou to reject the plane and demand a lower price after the visual inspection.

That argument doesn't fly. For starters, the Offer Letter gave Bonkoungou the express contractual right to walk away, "for any reason whatsoever." *See* 8/3/18 Offer Letter, at 2 (Dckt. No. 80-36, at 5 of 11). That all-encompassing phrase expressly included "the Buyer's decision not to proceed with the transaction following the Visual Inspection." *Id.* So, Bonkoungou had the right to look at the plane, and reject the deal that was on the table.

The implied covenant of good faith is a rule of construction, and is not a vehicle to erase express contractual rights. *See Voyles v. Sandia Mortg. Corp.*, 196 Ill. 2d 288, 256 Ill. Dec. 289, 751 N.E.2d 1126, 1131 (2001); *Trovare Capital Group, LLC v. Simkins Indus., Inc.*, 794 F.3d

54

772, 778 (7th Cir. 2015) ("This implied covenant applies in circumstances where one party has complete control over the occurrence of a condition precedent, and the covenant seeks to prevent that party from behaving 'arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'") (citation omitted); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) ("Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith'."). Bonkoungou did what the contract empowered him to do: demand a lower price, and walk away.

Brinley's theory lacks evidentiary support, too. There is no evidence in the record that Bonkoungou acted in bad faith. In fact, the record reflects all of the problems that Bonkoungou spotted with the plane.

Brinley's own counsel summarized the problems on the day of the inspection, in an email to Yunhua: "The viewing took place at 2 pm in Paris earlier today. I can advise you that the principal would like to proceed to purchase the Aircraft[.] However, *the Aircraft was not in a condition expected* and he therefore is requesting a discount of $2.5 million." *See* 8/29/18[41] Email[42] (Dckt. No. 80-43, at 1 of 12) (emphasis added).

The plane wasn't in great shape, as Brinley's own counsel acknowledged at the time. "There were a number of *snags and issues* in the cabin as well as *technical problems* (all listed in the attached report) which let the principal to be *deeply concerned* about the ability to bring the Aircraft back to a normal standard and the potential costs to accomplish this. These *problems*

---

[41] The inspection took place on August 30 in Paris, and due to the time change, Brinley's counsel sent this email from Connecticut on August 29. So the email did come after the inspection, even though the dates suggest the opposite.

[42] The emails from Brinley's attorney (*i.e.*, Brinley's agent) are admissions of a party opponent, and thus are not hearsay. *See* Fed. R. Evid. 801(d)(2)(D).

clearly reminded him of the actual year of manufacture of the plane as being 2010 and fostered in him a belief that *the Aircraft has not been properly maintained* during recent years." *Id.* (emphasis added).

And there's more: "Specific items, for example[], that need to be addressed to bring the Aircraft back to a normal and expected standard include repainting the exterior, all windows need to be sent for repairs, all carpeting needs to be replaced." *Id.* Brinley's counsel attached a 10-page report, complete with pictures, that summarized the many problems with the plane. *Id.*

The next day, Brinley's attorney sent yet another email to Yunhua, saying that the end buyer had demanded a lower price because of the condition of the plane. "He will not proceed with the purchase and is rejecting the aircraft unless there is a price deduction. This has nothing to do with contract delivery conditions and rectifying discrepancies. *It is based upon what was seen and discovered* and what was internally discussed as an appropriate price for an aircraft *of such age and such aesthetic condition overall*." *See* 8/30/18 (Dckt. No. 80-41, at 6 of 7) (emphasis added).

Brinley thinks that Bonkoungou acted in bad faith because a "representative for the end buyer had already viewed and photographed the A319 before the visual inspection and decided to proceed." *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 15, 18, 20, 22, 23, 24, 25, 27 (Dckt. No. 79). But the decision was up to Bonkoungou, the buyer. The Offer Letter entitled him to see the plane with his own eyes.

The facts at hand do not involve unanticipated opportunistic behavior, either. The implied covenant of good faith and fair dealing applies when a party exercises discretion under a contract in a manner that was unexpected. *See RBS Citizens, N.A. v. Sanyou Import, Inc.*, 525 F. App'x. 495, 499 (7th Cir. 2013) ("Illinois courts use the rule to prevent one party from depriving

another of the right to receive the benefit of the contract in a way the parties could not have contemplated at the time of drafting."); *In re Kmart Corp.*, 434 F.3d 536, 542 (7th Cir. 2006) (noting that the doctrine prevents "opportunistic behavior" and "self-serving cleverness"). The greater the discretion, the lesser the judicial review. *See Roan v. Keck, Mahin & Cate*, 1992 WL 104789, at *6 (7th Cir. 1992) ("The extreme breadth of [the contract's] discretion imposes a similar breadth upon 'the reasonable expectations of the parties' and concomitantly reduces the scope of judicial review in this regard virtually to zero.").

But here, Bonkoungou did exactly what Brinley anticipated. Ittihadieh (Brinley's principal) testified that he fully expected Bonkoungou to demand a lower price after the visual inspection as a "negotiating tactic to further reduce the price of the Aircraft." *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 79). According to him, buyers often use visual inspections as a final negotiating tool. *Id.* at ¶¶ 15, 18, 20, 22, 23, 24, 27 (Dckt. No. 79); Ittihadieh Dep., at 67:8-9 (Dckt. No. 80-3) ("It was always – we expected it, and we are provisioned for it.").

Brinley blames it all on Dusek. Brinley's theory is that "because Defendants had offered the A319 to Bonkoungou for $46 million, he was no longer willing to pay a purchase price that would make the transaction economically viable." *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 40 (Dckt. No. 82); *see also* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 79) ("[B]y the time the visual inspection took place, Defendants' conduct had already depressed the A319's price to the point where Plaintiffs were no longer provisioned to accommodate Bonkoungou's demand for a price reduction.").

That's just a theory, with no citation to the record. There is no supporting evidence. It is backed by nothing, so it counts for nothing. *See de la Rama v. Illinois Dep't of Human Servs.*,

541 F.3d 681, 685 (7th Cir. 2008) ("A nonmoving party cannot defeat a motion for summary judgment with bare allegations."); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("Conclusory allegations, unsupported by specific facts, will not suffice."); *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities."); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

In sum, Brinley has not come close to offering evidence that could support a claim of tortious interference with contract. The Court grants summary judgment to Defendants on Counts I–IV.

## II.      Tortious Interference with Prospective Economic Advantage

Brinley also brought three claims for tortious interference with prospective economic advantage. But once again, Brinley has not come forward with evidence to support a claim.

A claim of tortious interference with prospective economic advantage requires a plaintiff to prove "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 971 (7th Cir. 2015) (quoting *Voyles v. Sandia Mortg. Corp.*, 196 Ill. 2d 288, 256 Ill. Dec. 289, 751 N.E.2d 1126, 1133 (2001)).

As the name suggests, tortious interference with *prospective* economic advantage is about interference before there is a contract. The doctrine applies when a party has a reasonable expectation of entering into a business relationship. A reasonable expectancy requires "more than the hope or opportunity of a future business relationship." *Bus. Sys. Eng'g, Inc. v. Int'l Bus.*

*Machs. Corp.*, 520 F. Supp. 2d 1012, 1022 (N.D. Ill. 2007) (citing *Anderson v. Vanden Dorpel*,

172 Ill. 2d 399, 217 Ill. Dec. 720, 667 N.E.2d 1296, 1300 (1996)), *aff'd*, 547 F.3d 882 (7th Cir.

2008); *see also Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1154 (N.D. Ill. 2016);

*Davidson v. Schneider*, 2014 WL 656780, at *6 (N.D. Ill. 2014) ("Davidson's 'mere hope' of

additional business with Hill does not constitute a reasonable expectancy.").

Proving that a competitor entered the picture and spoiled a deal is not enough. A plaintiff

must prove intentional and unjustified interference. That is, the claim requires a showing of

impropriety. *See Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 230 Ill. Dec. 229, 693 N.E.2d

358, 371 (1998) ("[T]o prevail on the claim, a plaintiff must show not merely that the defendant

has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful

interference' – that the defendant has committed some impropriety in doing so."); Restatement

(Second) of Torts § 766B cmt. a (Am. Law Inst. 1979) ("In order for the actor to be held liable,

this Section requires that his interference be improper."). Examples include "fraud, deceit,

intimidation, or deliberate disparagement." *See Soderlund Bros., Inc. v. Carrier Corp.*, 278 Ill.

App. 3d 606, 215 Ill. Dec. 251, 663 N.E.2d 1, 8 (1995).

Competition itself is not a tort. Illinois law recognizes the so-called "competitor's

privilege," meaning that a market participant can "act to advance its interests at the expense of its

competitor." *See A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1405 (7th Cir.

1992); *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 867 (7th Cir. 1999). It allows

competitors "to interfere with one another's prospective business relationships provided their

intent is, at least in part, to further their businesses and is not solely motivated by spite or ill

will." *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 317 Ill. Dec.

855, 882 N.E.2d 1011, 1019 (2008); *see also Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir.

2018) ("Since a general duty not to interfere with an individual's business relationships is quite broad, Illinois courts announced that in certain situations, an individual may be privileged to interfere with another's business relationships – for example, in the context of lawful competition."); *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1224 (7th Cir. 1988) ("Legitimate competitive efforts, such as indicating interest in and making offers to acquire a company, are not tortious interferences with business.").

The key is not competition in and of itself, but competition through improper acts. *See Speakers of Sport*, 178 F.3d at 867 ("We agree . . . that the tort of interference with business relationships should be confined to cases in which defendant employed unlawful means to stiff a competitor."); *The Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 368 Ill. App. 3d 462, 305 Ill. Dec. 807, 856 N.E.2d 612, 620 (2006) ("[E]ven though competition will justify interference with a business relationship, if the manner of interference is improper, the interference will be actionable.").

Based on the record, Brinley has no claim, for a few basic reasons.[43]  For starters, Brinley has failed to come forward with evidence that Defendants unjustifiably interfered.  The record shows competition, not improper interference.

Brinley's theory is that Defendants interfered by offering to sell the plane to Bonkoungou at a lower price.  *See* Pls.' Mem., at 2 (Dckt. No. 77) ("[Defendants] drove the A319's price down by submitting proposals to Bonkoungou that drastically undercut Plaintiffs' prior offers,

---

[43]  The Court does not address whether there is sufficient evidence to support a finding that there was a reasonable expectation of selling the plane to Bonkoungou.  The Court simply notes that Bonkoungou never paid the deposit, as required by the Offer Letters.  And he never signed a Sale and Purchase Agreement, either.  Each Offer Letter provided that it would expire if the parties did not enter into a Sale and Purchase Agreement by a date certain.  *See* 5/9/18 Offer Letter (Dckt. No. 80-5) (setting an expiration date of June 5, 2018); 8/3/18 Offer Letter (Dckt. No. 80-36, at 5 of 11) (setting an expiration date of August 10, 2018).  Those dates came and went, without a Sale and Purchase Agreement.

prompting Bonkoungou to demand a last-minute price reduction after the final visual inspection, which destroyed the A319 transaction's viability."); *id.* at 13 (arguing that Defendants "deflat[ed] the purchase price for the A319 to the point where the transaction was no longer viable"); *id.* at 14.

But offering a better deal isn't a tort. It's capitalism. Competitors are allowed to compete – in fact, an efficient market depends on it. The free enterprise system depends on the freedom to compete. That's why Illinois law protects competition, including the ability of one market participant to offer a better deal. *See Speakers of Sport*, 178 F.3d at 865 ("There is in general nothing wrong with one sports agent trying to take a client from another if this can be done without precipitating a breach of contract. That is the process known as competition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system. Competition is not a tort, but on the contrary provides a defense (the 'competitor's privilege') to the tort of improper interference.") (citations omitted).

Brinley argues that Defendants competed in an illegitimate manner, by making false statements about what type of deal they could offer. Brinley points to statements about the existence of Bahamian buyer, the availability of financing, and so on. *See* Pls.' Mem., at 2 (Dckt. No. 77) (accusing Defendants of making "flagrant misrepresentations" and "deliberately false statements"); *id.* at 3 (citing the email about an agreement with a "Bahamian client"); *id.* at 4 (discussing whether the sale was contingent on the existence of an end buyer); *see also* 6/25/18 Email (Dckt. No. 80-18, at 3 of 4); Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 23 (Dckt. No. 82). Brinley faults Dusek for saying that he had an "experienced and efficient technical team." *See* Pls.' Statement of Additional Facts, at ¶ 16 (Dckt. No. 78).

Courts need to tread lightly when policing the truth or falsity of statements made during a competitive process. Especially when the alleged misstatements are about how good of a job the competitor would do. *See Speakers of Sport*, 178 F.3d at 866 ("There would be few more effective inhibitors of the competitive process than making it a tort for an agent to promise the client of another agent to do better by him . . . ."). Competitors often say that they can do a better job, or offer a better deal, so courts need to be wary of getting in the middle.

Here, the statements in question cannot support a claim. At the end of the day, there's no evidence that any of the statements made a difference. Brinley thinks that Yunhua backed out and turned to Dusek because of promises of a smoother deal. *See* Pls.' Statement of Additional Facts, at ¶ 29 (Dckt. No. 78); *see also* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 40 (Dckt. No. 82) ("Defendants' proposed transactions fell apart once Yunhua learned that Defendants had misrepresented certain facts concerning the transaction."). But again, Brinley relies on hearsay, not admissible evidence. *See* 8/5/18 Email (Dckt. No. 80-21, at 2 of 3). There's no admissible evidence that Yunhua did anything differently because of something that Dusek said.

Brinley is trying to create the impression that Dusek competed through fraud, by making False Statement X to the seller, who then decided to break its deal with Brinley and do a deal with Dusek. *See Speakers of Sport*, 178 F.3d at 865 ("[T]he competitor's privilege does not include a right to get business from a competitor by means of fraud . . . ."). But the evidence just isn't there.

The record is even thinner for the dealings with Bonkoungou. Brinley does not even argue – let alone present evidence – that Dusek made false statements to Bonkoungou, or that any false statements had any impact. *See* Pls.' Statement of Additional Facts, at ¶¶ 16, 23–29, 40

(Dckt. No. 78) (addressing alleged misrepresentations to Yunhua, not Bonkoungou); *see* Pls.'
Mem., at 10–11 (Dckt. No. 77) (arguing that Defendants made false statements to Yunhua).
There's nothing there.

And once again, Brinley cannot prove proximate causation. The simple reality is that
Brinley signed an Offer Letter with Bonkoungou on August 3, and entered into a Sale and
Purchase Agreement with Yunhua on August 23. Nothing said by Dusek prevented those deals
from closing. (And there's no evidence that Dusek's statements deflated the price, either.)

To bring a claim, Brinley would need to show that the alleged misrepresentations
proximately caused an injury, meaning that they caused the prospective deals with Yunhua and
Bonkoungou to fall apart. And there is no such evidence.

At times, Brinley tries to close the evidentiary gap through inflammatory rhetoric. For
example, Brinley accuses Defendants of "commercial bribery," contending that Defendants
offered a "kickback" to Moussa Diarra "in exchange for his help diverting the transaction away
from Plaintiffs." *See* Pls.' Mem., at 2, 4 (Dckt. No. 77); *id.* at 11 (alleging that Defendants "even
bribed Bonkoungou's employee, Diarra, to divert the A319 transaction to Defendant, by agreeing
to pay that agent a $2.67 million kickback"); *id.* ("That pay-to-play agreement violated multiple
state and federal statutes, including Illinois' [sic] prohibition on commercial bribery . . . and
federal anti-money laundering statutes . . . .").

That's a serious accusation (which no one should make lightly). As support, Brinley cites
an email from Dusek asking his lawyer to prepare a draft commission agreement with Moussa
Diarra. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶¶ 35–36 (Dckt. No. 82); *see
also* 7/20/18 Email (Dckt. No. 80-31) (email from Dusek to his counsel, and copying Diarra)

63

("Moussa and I are working closely on the A319ACJ transaction and we need a formal Transaction Commission Agreement executed between RSH Aviation and Moussa's group.").

Suffice it to say that there is no evidence that RSH and Diarra ever entered into any such agreement. Brinley cites an email requesting a draft agreement, not an actual agreement.[44] Maybe Brinley's theory was that RSH bought off Diarra through a side payment of some kind, and thus torpedoed Brinley's attempt to sell the plane to Bonkoungou. But if so, the evidence didn't pan out. There is no evidence that the draft agreement had any impact on the negotiations between Brinley and Bonkoungou, or between RSH and Bonkoungou.

There's no evidence that Bonkoungou cut off discussions with Brinley as a result of the draft commission agreement. In fact, Bonkoungou did not cut off discussions with Brinley at all. The record shows that Bonkoungou continued negotiating with Brinley, as demonstrated by the visual inspection one month later (at the end of August). He just didn't like the price for the plane, so he walked away.

## Conclusion

For the reasons stated above, Defendants' motion for summary judgment is hereby granted.

Date:   January 20, 2022

_____

Steven C. Seeger
United States District Judge

---

[44] Once again, Brinley's brief overplays its hand. *See* Pls.' Mem., at 4 (Dckt. No. 77) ("Defendants entered into a so-called 'commission agreement' with Mr. Diarra . . . .").